[No. 25440-9-II. Division Two. April 20, 2001.]

ROBERT P. HEATH, *Respondent*, v. NICK URAGA, ET AL., *Appellants*.

508

*Garold E. Johnson* (of *Mann, Johnson, Wooster & McLaughlin, P.S.*), for appellants.

*Barton L. Adams* (of *Adams & Adams*), for respondent.

*James R. Tomlinson* (of *Davies Pearson, P.C.*), for intervenors.

HUNT, J. — Nick and Lesley Uraga (Uraga)[1] appeal from a partial summary judgment order to raze the home they built in violation of subdivision covenants. We affirm.

## FACTS

### I. EVOLUTION OF SUBDIVISION BUILDING REVIEW COMMITTEE

The parties own separate lots in Miller's Panorama Park Second Addition, a West Tacoma subdivision with western views of the Narrows. The subdivision developers recorded restrictive covenants in the 1960s. Paragraph five of the covenants (1) established a committee comprising three named members to review building plans for any lot in the subdivision (the Committee); and (2) provided that if a Committee member dies or resigns, the remaining members, or member shall have authority to "approve or disapprove [structural] design and location *or to designate a representative with like authority*." (Emphasis added.) The covenants further provided that after 10 homes had been built, the resident owners were to meet and elect their own building-review Committee members.

In accordance with this provision, in 1987, the subdivision resident owners elected a new three-member Committee consisting of Pete Lisicich, John Mahan, and John Case. Case resigned in 1991, and Mahan resigned in 1992, leaving Lisicich as the sole member. Lisicich rejected one set of plans that Uraga submitted because the wall height was too high, the roof pitch was too steep, and the plans were too vague.

Lisicich was planning to move, so after his first designee declined, he designated Robert Heath as "representative" of the Committee. Lisicich then resigned.

---

[1] The property was subsequently transferred to Badger Business Trust, with Howard Rubin as Trustee, which has been substituted for the Uragas as the Appellants.

## II. Uraga Submits Building Plans for Review

Nick Uraga again proposed building a home on a lot. At Lisicich's direction, in late May 1997, Uraga presented Heath with building plans for a house.[2] Heath owned the lot uphill from Uraga and wanted at least one other person to work with him in his review of Uraga's plans. After three people declined, Mike O'Halloran and Bob Murray, whose previous acquaintance with Heath was limited, agreed to review Uraga's plans with Heath.

Heath noticed that Uraga's plans specified a roof pitch of 3/12,[3] whereas the covenants allowed a pitch no greater than 2/12.[4] Heath asked Uraga to erect a "story pole" to ascertain the finished height of the roof peak. Uraga replied, "I don't have to because it's not covered in the covenants." Heath later made a second request to Uraga's builder, Greg Hoover, to erect a story pole, but that request was also rejected.

Heath, O'Halloran, and Murray each independently reviewed Uraga's plans. The plans Uraga provided did not indicate the anticipated grading level of the property or the starting elevation for the foundation. Nor did the plans provide enough information to determine the final roof peak elevation. Heath scaled the plans to ascertain the height from foundation to roof, made his own story pole, and conducted tests to determine the degree of view impairment the proposed house could cause.

All three men independently concluded that the proposed roof would be too high, the pitch too steep, and the plans noncompliant with the covenants. On June 14, 1997, Heath sent Uraga a letter declining approval of his plans because

---

[2] It is unclear whether Lisicich was still a Committee member at this time. But according to Uraga, Lisicich had told him that Heath was the person with authority to review the plans.

[3] This fraction (and other fractions such as 2/12 contained herein) denotes a pitch ratio of 3 feet of vertical rise to every 12 feet of horizontal run.

[4] Unless the Committee (or its representative) determines the greater pitch "will not destroy or impair the view from nearby properties."

his building proposal did not comply with the covenants.

Uraga decided that Heath, Murray, and O'Halloran were not officially Committee members and that they lacked authority to act on his plans. Uraga and his wife gathered signatures on a "Petition for Exemption" from more than 50 percent of the homeowners in the subdivision.[5]

Uraga then had the building plans redrawn for a home that was substantially taller than the one depicted in the plans he had submitted to Heath for review and substantially different from the plans for which he had gathered signatures in his Petition for Exemption. Uraga never submitted these new designs to Heath for review. With no prior Committee approval, Uraga began constructing this newly designed home in April 1998.

## III. LAWSUIT

Heath[6] sued, alleging that Uraga violated restrictive residential covenants and seeking a permanent injunction, damages, costs, and fees; he served Uraga on April 29, 1998, and May 6, 1998. By this time, Uraga had completed some grading of the site, but he had not yet poured the foundation. The trial court denied Heath's motion for an injunction, warning Uraga,

> [A]nything that was done after notice of this lawsuit and after the point where the issue has been raised, the Defendant is doing at his own risk.
>
> I'm not going to have any argument that he just kept blithely going and then say, "Now it's too late, Your Honor, I can't take this down." That will not cut any mustard whatsoever with this court.

Report of Proceedings (Mar. 10, 1999) at 8.

The trial court granted Heath partial summary judgment

---

[5] This "Petition for Exemption" purported to allow Uraga to build a house of 5/12 pitch with a total height above foundation of 21 feet, 4 and 3/4 inches, but subject "to any . . . other terms contained within the restrictive covenants which remain in force unaltered."

[6] Several other subdivision members joined this suit.

and found that Heath, Murray, and O'Halloran constituted a valid Committee, formed in accordance with all procedural covenant requirements. The court limited the issue for trial to whether the Committee acted reasonably in rejecting Uraga's proposal.[7] Uraga continued to build his home, which he had almost completed by the time of trial in June 1999.

At trial, the court found that: (1) the Committee acted reasonably; and (2) Uraga's house violated the subdivision covenants for height,[8] substantial impairment of other owners' views, and excessive roof pitch. The court encouraged the parties to negotiate a lowering of the house to meet acceptable height limits, but Uraga refused.

Following Uraga's refusal to negotiate lowering the height, the trial court ordered the house torn down to the foundation. Uraga appealed.

## ANALYSIS

## I. SUMMARY JUDGMENT

### A. STANDARD OF REVIEW

We review orders of summary judgment de novo. *Enter. Leasing Inc. v. City of Tacoma*, 139 Wn.2d 546, 551, 988 P.2d 961 (1999). When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. CR 56(c). The court must consider all facts and all reasonable inferences from them in the light most favorable to the

---

[7] The trial court determined that Uraga's preferred exemption petition was not important to the analysis of the case.

[8] The house exceeded acceptable height limits by 9.1 feet.

nonmoving party. *Wilson*, 98 Wn.2d at 437.

■■ After the moving party submits adequate affidavits, the nonmoving party must set out specific facts sufficiently rebutting the moving party's contentions and disclosing the existence of a material issue of fact. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). The nonmoving party may not rely on speculation, argumentative assertions that unresolved factual issues remain, or having its affidavits accepted at face value. *Seven Gables Corp.*, 106 Wn.2d at 13. The court should grant the motion only if, from all the evidence, reasonable minds could reach but one conclusion. *Wilson*, 98 Wn.2d at 437.

B. Heath's Authority to Review Building Plans

1. Designated Committee Representative Under Covenants

Heath's authority to consider and to reject Uraga's building plans emanates from the covenants, which provide in pertinent part:

> No buildings shall be erected . . . on any building plot in the sub-division until the building plans, specifications, and plot plan showing the location of such building have been approved in writing . . . by a committee . . . *or by a representative* designated by a majority of the members of said committee. In the event of death or resignation of any member to said committee, *the remaining member*, or members, *shall have full authority* to approve or disapprove such design and location *or to designate a representative with like authority*.

Clerk's Papers at 33 (emphasis added).

Lisicich, as the sole remaining member of the duly elected Committee, was acting under authority of this covenant when he designated Heath "a representative." As a representative, Heath had "like authority" as a Committee member and, thus, was the functional equivalent of a Committee member. Because there were no other remain-

ing "members," Heath alone had "full authority to approve or disapprove" the design and location of Uraga's proposed building.

■ Uraga argues that Heath lacked authority because he was merely the "agent" of the Committee and that the agency relationship terminated when Lisicich resigned from the Committee. We disagree. Heath was clearly functioning, not as Lisicich's agent,[9] but as a Committee representative, designated according to covenant procedures. The covenants grant a designated representative the same authority to review building plans as the Committee would exercise.[10]

■ The covenants allow a Committee member to appoint a representative to review proposed building plans with the same authority as a Committee member. This authority is not limited or terminated upon the appointing Committee member's death or resignation. Accordingly, Heath had authority under the covenants to review Uraga's plans.

---

[9] An agency relationship exists when one party, the principal, consents to another party's acting on his or her behalf, subject to his or her control, and the other party consents to act on the principal's behalf, subject to his or her control. RESTATEMENT (SECOND) OF AGENCY § 1; *Dep't of Ret. Sys. v. Kralman*, 73 Wn. App. 25, 29, 867 P.2d 643 (1994) (citing *Moss v. Vadman*, 77 Wn.2d 396, 463 P.2d 159 (1969)). This "control" element is essential to the existence of an agency relationship. The agency relation exists

if, but only if, there is an understanding ... which ... creates a fiduciary relation in which the fiduciary *is subject to the directions of the one on whose account he acts. It is [this element of subjection] which distinguishes the agent from other fiduciaries and the agency agreement from other agreements.*

RESTATEMENT (SECOND) OF AGENCY § 1 cmt. b (emphasis added). This Restatement view has long been entrenched as the rule in Washington. *See, e.g., McCarty v. King County Med. Serv. Corp.*, 26 Wn.2d 660, 680-81, 175 P.2d 653 (1946) (citing and discussing this "familiar rule").

Here, the "control" element is lacking. There is nothing in the covenants or the record to indicate that Lisicich retained any control over Heath's review powers as representative of the Committee. The covenants do not limit his authority.

[10] Assuming that Heath had authority to review the plans, he did so in compliance with the covenants' requirement that he act within 30 days of their submission. Uraga presented his plans to Heath in late May 1997 and Heath sent a letter rejecting those plans on June 14, 1997. Uraga does not contest this issue.

## 2. Alternate Ground On Which to Affirm Trial Court

■ The trial court found that "pursuant to the terms of the covenants . . . Heath was authorized to appoint two additional members of the architectural control committee." But as Uraga correctly notes, the covenants do not provide for a mere representative, as compared to a Committee member, to appoint new members to the Committee. Rather, as Uraga states, "The only authority delegated to a representative is . . . 'authority to approve or disapprove [the submitted plans and proposed location]' " for a house. Br. of Appellant at 15, 17 (quoting Clerk's Papers at 33). Thus, the trial court's ruling that Heath could appoint Committee members was in error.

■■ This does not mean, however, that the trial court's final orders were in error. We may affirm entry of summary judgment on grounds other than those relied on by the court below. The law is clear that "an appellate court may sustain a trial court on any correct ground, even though that ground was not considered by the trial court." *Nast v. Michels*, 107 Wn.2d 300, 308, 730 P.2d 54 (1986) (citing *Reed v. Streib*, 65 Wn.2d 700, 709, 399 P.2d 338 (1965)).

Under the covenants, Heath had authority acting alone, as the Committee representative, to review and to approve or to reject Uraga's plans. Because he had authority to act alone to review the plans, the covenant provisions were satisfied, even though he could not appoint Committee members. Moreover, no covenant provision prohibits a representative from seeking input from non-Committee advisors, such as the two other lot owners whom Heath recruited to review the plans. That Heath conferred with two other homeowners, in addition to reviewing the plans independently, does not defeat his authority under the covenants to review and to reject the plans Uraga submitted.[11]

---

[11] That Heath sought to compare his own impressions and investigation with others before acting also tends to negate Uraga's contention that Heath's rejection of the plans was in bad faith.

■ Therefore, we affirm the trial court's grant of summary judgment to Heath on the basis of Heath's authority as a Committee "representative" to review Uraga's plans and to reject them as noncompliant with the subdivision's restrictive covenants.[12]

## II. TRIAL AND JUDGMENT

### A. STANDARD OF REVIEW

■ Where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law. *Ridgeview Props. v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). We presume that the trial court's findings are correct; the party claiming error bears the burden of proving that the findings were not supported by substantial evidence. *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990). Here, substantial evidence supports the trial court's findings.

### B. HEATH'S REJECTION OF URAGA'S PLANS—REASONABLE AND IN GOOD FAITH

■ ■ When confronted with a case where a review committee or its representative has withheld consent to a proposed building plan, the court determines whether that

---

[12] Heath argues that Uraga is equitably estopped from denying that Heath was the proper party to review Uraga's building plans. Equitable estoppel is an affirmative defense and must be pleaded. CR 8(c). "[I]f such defenses are not affirmatively pleaded . . . or tried by the express or implied consent of the parties, [they] are deemed to have been waived." *Farmers Ins. Co. v. Miller*, 87 Wn.2d 70, 76, 549 P.2d 9 (1976). *See also Harting v. Barton*, 101 Wn. App. 954, 962, 6 P.3d 91 (2000) (holding same).

Here, Heath failed to plead equitable estoppel; nor was this defense tried with the parties' consent. A pleading is insufficient if it does not give fair notice of what the claim is and the ground upon which it rests. *Lewis v. Bell*, 45 Wn. App. 192, 197, 724 P.2d 425 (1986) (citation omitted). Because Heath did not plead estoppel, Uraga was not given notice of the defense. Moreover, the record contains no findings on estoppel. Apparently Heath is raising this theory for the first time on appeal, and we need not consider it. RAP 2.5(a).

refusal to consent was reasonable and made in good faith. *Riss v. Angel*, 131 Wn.2d 612, 624, 934 P.2d 669 (1997). Here, the trial court found that Heath,[13] as well as O'Halloran and Murray, was "fair" in his analysis and reviewed the plans "in good faith."

Uraga claims that the evidence does not support the trial court's finding that Heath acted fairly, but Uraga does not adequately cite the record to specify why.[14] Not only has Uraga failed to meet his burden to demonstrate why substantial evidence does not support the trial court's findings, but also he has not overcome the presumption that substantial evidence supports the trial court's findings. *Fisher Props.*, 115 Wn.2d at 369.

On the contrary, the record, including the unchallenged findings of fact, contains substantial evidence to support the trial court's findings that Uraga now challenges. First, the covenants mandate that no roof shall have a pitch greater than 2/12 unless the Committee determines that "additional height will not destroy or impair the view from nearby properties." The record clearly shows that the plans Uraga submitted to Heath called for 10-foot walls and a roof with a 3/12 pitch. Moreover, the covenants charged the Committee (or its representative) to determine whether a roof with a pitch greater than 2/12 would impair the view of other property owners. But when Heath asked Uraga to erect a "story pole" to ascertain the final height of the roof peak, Uraga refused, stating, "I don't have to because it's not covered in the covenants." The record also shows that when Heath made a second request to erect a story pole, Uraga's builder also refused.

Second, the record shows that Heath took extra care to

[13] The covenants do not bar appointing as Committee representative, a homeowner, such as Heath, whose view might be affected by a proposed building plan, especially where it appears that finding lot owners willing to serve on the Committee, whether as members or as a representative, was difficult.

[14] In essence, Uraga's argument seems to be that: (1) because Heath lived uphill from the Uraga lot, he had a potential bias if left alone to decide whether to endorse Uraga's plans; (2) because he had a potential bias, he inevitably would reject the plan; (3) therefore, he could not have acted reasonably; and (4) further support that he in fact *did not* act fairly was therefore unnecessary.

assure an objective evaluation of Uraga's building height. Heath did not simply reject Uraga's proposal as violating the covenants. Instead, Heath independently conducted a "reasonable investigation" of Uraga's plans, by (1) reviewing the plans over several days; (2) investigating the roof pitch, wall height, and foundation height; (3) using a scale to determine the height of the house from the top of the foundation to the top of the roof; and (4) making his own story pole measurement to determine the extent of view impairment.

Third, Heath also asked O'Halloran and Murray to assist him in reviewing Uraga's plans.[15] All three independently investigated and determined that the plans (1) were either too vague to determine the final height of the roof peak; (2) called for a roof pitch that was too high; or (3) otherwise violated the covenants. Murray, an engineer, also compared the plans that Uraga submitted to Heath with an earlier set of plans that Uraga had submitted to Lisicich. Lisicich had previously rejected these plans *before* appointing Heath as the Committee representative. Murray found the plans currently being reviewed to be identical to the earlier plans that Lisicich had rejected. At the conclusion of this thorough, collaborative effort, Heath similarly rejected Uraga's building plans as violating the covenants, and he sent Uraga a letter explaining that the plans were not approved for building.

The covenants clearly prohibit building a home unless the Committee, or its representative, has approved the proposed building plans, specifications, location of the house on the lot, conformity and harmony of the external design with other subdivision homes, topography of the

---

[15] Although ineligible as Committee "members" under the covenants, nothing prevented Heath from seeking Murray's and O'Halloran's input. Moreover, they conducted their investigations independently of Heath. The covenants do not require a Committee representative to seek outside counsel. That Heath sought input from others, rather than act alone without such input, and that Heath did not oversee their independent review, further suggests his good faith effort to reach a reasonable, objective decision.

property, and finished ground elevation.[16] Likewise, they require the Committee, or its representative, to determine whether a roof pitch steeper than 2/12 will impair the view from other properties before allowing an exemption to that standard.

Here, given the paucity of information Uraga provided and Uraga's lack of cooperation in remedying these deficiencies, Heath put forth more effort than was reasonably required, such as erecting a story pole to ascertain the proposed height. And Uraga built his house with full knowledge that his building plans were incomplete,[17] that they had not been approved by the Committee or its representative, and that his building height was too high, obstructing others' views, contrary to the express terms of the covenants.

The record supports the trial court's determination that in reviewing Uraga's plans, Heath acted fairly, reasonably, and in good faith. Therefore, in accord with the presumption, substantial evidence supports the trial court's findings.

### C. URAGA'S VIOLATIONS OF RESIDENTIAL COVENANTS GOVERNING HEIGHT AND VIEW IMPAIRMENT

Uraga argues that because the trial concerned only whether the Committee exercised authority "reasonably and in good faith," the trial court exceeded its authority in

---

[16] The only exception provided in the covenants is where a lot owner has submitted complete proposed building plans and the Committee, or its representative, has failed to act or to respond within thirty days. The covenants specifically provide:

> In the event said committee or its designated representative, fails to approve or disapprove such design and location within thirty (30) days after said plans and specifications have been submitted to it, such approval will not be required and this Covenant will be deemed to have been fully complied with.

Clerk's Papers at 33.

[17] Uraga does not challenge Finding VII, that the plans "did not indicate the anticipated grading level of the . . . property or the starting elevation of the foundation for the home." Nor does he challenge Finding VI, that the plans "did not contain sufficient information for a person reviewing those plans to determine the elevation of the roof peak of the house designed for [Uraga]."

finding: (1) "The overall height of the house is excessive when compared to other homes in the subdivision"; and (2) "[t]he home substantially impairs the view from surrounding properties." Uraga contends that decisions regarding aesthetics and harmony within the subdivision are the Committee's exclusive domain and, therefore, the trial court erroneously substituted its judgment for the Committee's.[18] We reject this argument.

 First, Uraga provides no citation to the record to demonstrate that he raised this argument below, and under RAP 2.5(a), we may refuse to consider any claimed error that was not raised in the trial court. Thus, Uraga is barred from raising this argument now.[19]

---

[18] Uraga limits this authority to a "properly constituted Committee" and carefully omits the use of the phrase "or its representative."

[19] Even were we to address this argument, Uraga would lose for the following reasons:

1. *Excessive Height* — Uraga does not challenge the trial court's finding that the information he provided was insufficient to determine the overall height of the proposed home. When those plans were rejected, he refused to submit further plans to Heath, knowing that Committee member Lisicich had appointed him to be the Committee's representative. Then Uraga defiantly built a home with an even higher pitched roof than previously depicted, without submitting these revised plans to anyone for review and without Committee, or representative, approval.

Although the record supports the trial court's challenged findings, Uraga provides no citation to the record to support his contention that the trial court's findings were in error. With regard to the excessive height finding, it is uncontested that the Uraga house "has 10-foot walls with ceilings of 10 feet or higher throughout the house." Similarly it is uncontested that "*no other homes within the subdivision in view-sensitive areas [have] walls higher than 8 feet.*" (Emphasis added.) These unchallenged findings support the court's conclusion that Uraga's home was excessively tall. Again, Uraga fails to overcome the presumption in favor of the court's findings.

As for the house Uraga ultimately built, the trial court did not substitute its judgment for that of the Committee. Uraga never presented Heath, the one person duly appointed to do the Committee's work, the opportunity to review the plans for that house. Here, when asked to resolve the ensuing conflict, the trial court acted within its appropriate sphere and entered appropriate findings of fact and conclusions of law based on the record.

2. *View Impairment* — Likewise, substantial evidence in the record supports the court's finding that Uraga's house "substantially impairs the view from surrounding properties." For example, surveyor Daniel Johnson testified that had Uraga's home been built with eight-foot walls and a 2/12 pitch roof, in conformance with the covenants, Heath would be able to look out from his deck and see the water at the Tacoma Narrows, Gig Harbor, the water in front of Gig Harbor, and the

## D. ORDER TO RAZE URAGA'S HOUSE

Uraga argues for the first time on appeal that the trial court should have ordered the roof peak lowered 9.1 feet—to the height that would have resulted if the house had been built with 8-foot walls and a 2/12 pitch roof. We reject this argument for several reasons.

First, Uraga failed to raise this argument to the trial court. Therefore, RAP 2.5(a) precludes his making the argument for the first time on appeal. Moreover, not only did Uraga fail to seek this relief below, but also he expressly *rejected* the trial court's invitation to consider lowering the roof as a reasonable solution. Before entering the final order, the trial court asked the parties to negotiate and try

---

horizon. But Uraga's home as constructed obliterates all that view. The court also could compare Johnson's testimony with the map Johnson referenced and a photograph Heath submitted. Again, Uraga fails to counter this substantial evidence with citations to the record. Again, Uraga fails to meet his burden.

3. *Roof Pitch Too Steep* — Paragraph four of the covenants provides that no structure shall have a roof pitch steeper than 2/12 unless the Committee determines the additional height will not impair the view from nearby properties. It is undisputed that Uraga's house has a 5/12 roof pitch and that he never submitted the plans depicting such a steep pitch to the Committee or its representative to determine whether the additional height would impair views. Thus, the pitch of Uraga's roof clearly violates the covenants.

Moreover, contrary to Uraga's contention, the trial court did not find the 5/12 pitch to be a per se violation. Rather, the pertinent conclusion of law states that Uraga's home violates the covenants "because it has a roof with a pitch steeper than [2/12] *in an area which significantly impairs the views of surrounding properties.*" (Emphasis added.) Nor, as Uraga attempts to argue, is paragraph four rendered superfluous in light of paragraph five's requirement of Committee consent regardless of the roof pitch, because paragraph five also allows the Committee to appoint a representative to act with full consent authority, and Uraga failed to submit to Heath's authority.

Furthermore, the trial court's conclusion that Uraga's house violates the covenants is buttressed by both uncontested findings of fact and contested findings that are nevertheless supported by substantial evidence. It is undisputed that: (1) the roof has a 5/12 pitch; (2) Uraga never submitted the final building plans to Heath; (3) Uraga's home is the only home in view sensitive area with walls higher than eight feet. And, substantial evidence supports the trial court's findings that: (1) the height of Uraga's house is excessive when compared to other homes; and (2) the house substantially impairs the view from surrounding properties.

Finally, Uraga cites no evidence to support his hypothesis that other houses have been constructed in the subdivision with a pitch in excess of 2/12 without appropriate review. Rather, the record is to the contrary.

to settle the matter by agreeing on lowering the roof. Heath agreed to negotiate on those terms, but Uraga refused, thus forcing the court to rule on whether the house as a whole, as built, violated the covenants both in substance and in the review process that Uraga chose or avoided.

█ Second, Uraga again argues that the trial court usurped the Committee's authority. Again, this argument fails because Uraga never submitted his final building plans to the Committee or its representative. Uraga skirted the covenants, failed to submit his final plans for review, and built the house the way he wanted, without prior Committee or representative approval, in violation of height and view blockage covenant restrictions. Therefore, the trial court was justified in ordering Uraga's house torn down to the foundation.

The Committee or its representative is charged with reviewing height, house placement on the site, foundation elevation, roof design, view blockage, and harmony with the subdivision community plan. Uraga is correct that the trial court could not step into the Committee's role to determine how it would weigh the various factors to be considered and resolve them. But the Committee representative, Heath, never had the chance to review Uraga's final, unsubmitted building plans. Consequently, the only remedy left for the trial court to impose was ordering Uraga to tear the house down to its foundation based upon the representative's determination that the house as built violated the covenants and was not properly submitted for review and approval.

### E. PETITION SIGNATURES

█ Uraga also contends that the trial court erred in finding the proffered "Petition for Exemption" evidence irrelevant to its analysis. We disagree. Admission of evidence is within the trial court's sound discretion, which we will not disturb absent a showing of abuse of discretion. *State v. Stubsjoen*, 48 Wn. App. 139, 147, 738 P.2d 306

(1987). Uraga has not shown such abuse here.

■ First, Heath was the duly authorized Committee representative, with authority to review proposed residential building plans. The covenants provide a single avenue for a potential new resident to seek exemptions from the covenant restrictions on building height: Variations are prohibited, *"except where determined by the committee* that additional height will not destroy or impair the view from nearby properties."* (Emphasis added.) Because Heath had "full authority" to review Uraga's plans, the covenants required Uraga to seek any desired exemption from Heath. That Uraga's neighbors signed his petition favoring his proposed deviation from the covenants' height restrictions has no bearing on the issue of whether Uraga's house, as built, complied with the covenants.

Second, the covenants do not authorize a petition as a method for obtaining an exemption from covenant restrictions or for overriding the decision of the Committee or its representative. Uraga apparently relies on the "majority vote" provision of the covenants' paragraph one. But that provision outlines a method by which the residents may *amend the covenants*; it is not a method for circumventing them. No provision allows a prospective homebuilder to obtain an exemption by soliciting signatures from subdivision residents.

Finally, even if other subdivision residents at large could have approved an exemption, their signatures assented to Uraga's construction of a house to be built "21 feet 4 and 3/4 inches" above the foundation. Moreover, Uraga's petition contained a pledge: "This *exemption is limited to the above-specifications* and does not apply to any of the other terms [in] the restrictive covenants which remain in force unaltered."[20] (Emphasis added.) But Uraga built a house 23 feet and 4 inches above the foundation. Thus, Uraga did not

---

[20] The petition purported to grant an exemption only from the roof pitch limitation of paragraph four of the covenants and to allow the height from the foundation to rise to 21 feet, 4 and 3/4 inches. Therefore, paragraphs five and ten presumably remained in effect. As such, the petition could not have exempted Uraga from submitting plans to the Committee regarding design and elevation

build the same house that he now claims the petition exempted from the covenants' height restrictions.[21] We hold that the trial court did not abuse its discretion in excluding the petition signatures as unnecessary to its analysis.

In conclusion, *no* homeowner or Committee member or representative approved the plans that Uraga ultimately used to build his house. Rather, Uraga built what he wanted and how he wanted, without regard to the subdivision covenants and his neighbors. He thereby assumed the risk that his house would ultimately be found to be noncompliant and subject to correction or demolition.

Affirmed.

ARMSTRONG, C.J., and BRIDGEWATER, J., concur.

Review denied at 145 Wn.2d 1016 (2002).

---

(Clerk's Papers at 33, para. 5) or the height. (Clerk's Papers at 34, para. 10.) Because Article V allows the Committee to appoint a representative, Uraga would still have to submit his new proposal (and, presumably, his signed petition) to Heath to obtain approval before beginning construction. His own petition bound him to these other provisions.

[21] Even if Uraga would have been somehow entitled to build his home as specified in the petition, it does not follow that he could then unilaterally abandon those specifications and instead build any house he chose, using plans never mentioned in the petition.