[No. 50462-2-I.   Division One.   July 28, 2003.]

RUSSELL DAY, ET AL., *Respondents*, v. JULIE SANTORSOLA, ET AL., *Appellants*.

748

*Michael E. Gossler* (of *Montgomery, Purdue, Blankinship & Austin, P.L.L.C.*), for appellants.

*H. Troy Romero* and *Justin D. Park* (of *Romero Montague, P.S.*) and *Marion E. Morgenstern*, for respondents.

SCHINDLER, J.— Russell and RuthAnne Day purchased a lot in the Burton Estates subdivision. The subdivision has restrictive covenants which require a committee (Committee) to consent to construction of a house. The Committee rejected proposed plans for the Days' house. The Days sued the Committee and all the property owners, alleging that the Committee's rejection of their plans was not permitted under the covenants and that the Committee acted unrea-

sonably and in bad faith. The trial court concluded that the intent of the covenants was to regulate the height of houses, not to protect view, and that the Committee's rejection of the Days' revised and compromise plans was not reasonable and was not in good faith. The court entered judgment in favor of the Days, finding that they are entitled to build a house on their lot, not to exceed a specified height and roof pitch, and awarded them attorney fees as the prevailing parties.

We affirm the trial court's interpretation of the covenants and its conclusion that the Committee acted unreasonably and in bad faith by rejecting the Days' plans. We reverse the trial court's imposition of height and roof pitch limitations, however, and remand for the entry of a judgment that allows the Days to construct a house pursuant to either their revised plans or their compromise plans. We also remand for entry of findings of fact and conclusions of law setting forth the way in which the trial court determined the award of attorney fees to the Days. We award the Days attorney fees on appeal as prevailing parties.

## FACTS

Burton Estates is a 20-lot subdivision located on a hillside in the Juanita/Kirkland area. Many of the lots have views of Mount Rainier, Lake Washington, and Bellevue. Restrictive covenants for each lot were recorded when the Burton Estates plat was filed in 1958. The provisions of the covenants relevant to this appeal include:

- [T]he restrictions hereinafter set forth with respect to height limitations of trees or other natural objects, buildings or other man-made structures, shall never be changed.[1]

- No building shall be erected, placed or altered on any tract until the building plans, specifications and plot plan showing the location of such building shall have been approved in writing by the committee as to all conditions of design and

---

[1] Ex. 42, at 1.

construction, and particularly as to height and as to conformity and harmony of external design with existing structures in the above-described property, and as to location of the building with respect to topography and finished ground elevation.[2]

- No building shall be erected or maintained on any tract when any part thereof shall be nearer than 25 feet from said easement premises, nor nearer than 25 feet from the boundary of such tract most distant from said easement premises, nor nearer than ten feet from any side tract line.[3]

- No structure shall be erected, altered, placed or permitted to remain on any tract within the above-described premises other than one detached single family dwelling for single family occupancy only, not to exceed two stories in height (as limited by the power of the committee to limit the height of any structure in said premises), the habitable main floor of which, exclusive of garage, open entries, porches and patios shall not be less than 1,200 square feet, except a private garage for not more than three cars and outbuildings incidental and necessary to residential uses of the premises.[4]

- No trees or shrubs shall be permitted to remain or allowed to grow to a height exceeding 20 feet, nor to any height which tends to block the view from other tracts within said premises.[5]

- The provisions of this instrument may be enforced by any owner of any property included in said subdivision ("owner" shall be construed to include mortgagors and contract vendees) upon the violation or attempt to violate any of the provisions hereof, by any proceeding at law or in equity either to prevent him or them from such violation or to recover damages arising from such violation; and in the event a successful action is instituted by any person, the person or persons instituting such action shall be entitled to

---

[2] Ex. 42, at 3.

[3] Ex. 42, at 4.

[4] Ex. 42, at 4.

[5] Ex. 42, at 5.

their costs incurred, together with a reasonable attorney's fee to be fixed by the Court.[6]

In 1998, the Days purchased Lot 14, an undeveloped lot in Burton Estates. In May 1999, they complied with the requirements of the covenants and submitted plans for a house to the Committee for its approval. In May 1999, the Committee was comprised of Julie Santorsola, David Heimbach, and Howard Barnebey. The Santorsolas own a house located behind and uphill from Lot 14 and the Days' proposed house.

On June 2, 1999, the Days submitted a building permit application with their proposed plans to the City of Kirkland. On June 12, 1999, the Committee informed the Days by letter that it rejected their plans because: (1) the plans showed a three-story house, not a two-story house; (2) the proposed house would block all of the Santorsolas' views from their first floor and partially obstruct their views from the second floor and would impact views from three other properties; (3) the plans violated the restriction that garages could be no larger than a three-car garage; and (4) the proposed house violated setback lines on two sides.

On June 21, 1999, Mr. Day met with the Committee and raised concerns about Santorsola's participation in the review of the Days' plans because of her interest in protecting the view from her house.

On June 30, 1999, the Days submitted revised plans that addressed and corrected the third and fourth reasons the Committee disapproved their original plans, specifically, the size of the garage and the violation of setback lines. The Days disputed the Committee's conclusion that their plans called for a three-story house and that a daylight basement should be considered a story. They also disagreed that the covenants permitted rejection solely because of the impact of the proposed house on other homeowners' views. The Committee held a meeting regarding the revised plans on July 22, 1999. At that meeting, Santorsola recused herself

---

[6] Ex. 42, at 2.

from the Committee for purposes of considering the Days' revised plans, and Chuck Carey replaced her. The Committee rejected the revised plans by letter dated July 25, 1999. Carey testified, however, that when he became a member of the Committee, the decision to reject the revised plans had already been made, and he did not participate in drafting the July 25 rejection letter.

The Committee stated in its July 25 letter that it rejected the Days' revised plans because:

- The Days did not provide information the Committee had requested regarding elevations.
- The plans called for a house of more than two stories because the daylight basement was not completely below the current mean grade of the property.
- The height of the proposed house had a negative impact on the view from the Santorsolas' house and would cause them to completely lose their views from their first floor and partially lose them from their second floor.
- The pitch of the roof was too steep and not in keeping with the neighborhood.
- The north edge of the house violated setback requirements.
- The basement was visible from the street.

In August, 1999, the Santorsolas hired a site line surveyor. According to the survey, reducing the height of the Days' proposed house to 118 feet would preserve most of the views from the second floor of the Santorsolas' house and some of the views from the first floor. The Santorsolas provided the survey to the Committee.

On October 4, 1999, the Days met with the Committee and discussed the height of their proposed house. According to Mr. Day, the Committee told him it would not require the Days to reduce the height of the house by 10 to 12 feet. But, if a two- to four-foot reduction in height would significantly reduce the loss of views for the Santorsolas, then the Committee might require the Days to do that. According to the Committee's minutes, it decided that the idea of reduc-

ing the height of the Days' proposed house by two to six feet was worth considering.

The Santorsolas then hired an architect to review the Days' revised plans. By letter dated November 15, 1999, the Santorsolas, based on what their architect had told them, asked the Days to move their garage and reduce the height of the house by 12 feet. In January 2000, the Days rejected the Santorsolas' proposed changes.

By this time, the Days had relocated to Olympia. Their builder expressed interest in purchasing Lot 14. But, according to the builder, the Committee told him that its only concern in approving plans for construction on the lot was satisfying the Santorsolas. The builder met with the Santorsolas and concluded that they would be satisfied only with a house that was 10 to 12 feet shorter than the Days' proposed house. Eventually, the builder decided not to purchase Lot 14. The Days then offered to sell the lot to the Santorsolas and/or two other property owners in Burton Estates, the Coxes and the Gruhns. This offer was not accepted.

In July 2000, the Days and their lawyer sent the Committee a letter proposing a compromise along with additional changes to the revised plans. These plans, referred to as the compromise plans, proposed a 6-foot reduction in height to a maximum roof height of 119 feet and a reduction in the pitch of the roof to 4 feet by 12 feet.

The Committee rejected the compromise plans by letter in August 2000 because the Days had not submitted plans that complied with the Committee's required changes.

The Days filed a lawsuit on September 1, 2000 against the Committee members and all Burton Estates lot owners, alleging breach of contract and breach of fiduciary duty, and seeking a declaratory judgment, damages, and an award of costs and attorney fees.[7]

---

[7] The defendants will be referred to as "the Committee." The Days agreed that the defendants who signed stipulations consenting to the entry of the trial court's judgment are not liable for attorney fees and costs incurred by the Days.

A bench trial was held. The trial court entered 120 findings of fact and 44 conclusions of law. The court concluded: "[t]he language used in the Covenants emphasizes height, not view . . . ."[8] The court also concluded:

the Committee's decision to disapprove the Days' Original Plans was not reasonable or made in good faith. The Committee's actions with respect to the Revised Plans were not reasonable nor made in good faith. The Committee's rejection of the Compromise [Plans] was also unreasonable.[9]

The court entered judgment finding that the Days are entitled to build a house on Lot 14 as long as the height of the house is 118 feet or less and the pitch of the roof is 4 feet by 12 feet or less. The Days requested $156,369.26 in attorney fees. The court entered judgment for $97,362 in attorney fees and $11,166.40 in costs to the Days as the prevailing parties.

The Committee appeals the trial court's interpretation of the covenants and its determination that the Days are entitled to build a house on Lot 14 and that it acted unreasonably and in bad faith in rejecting their plans. The Days cross-appeal the trial court's refusal to allow them to build a house in accordance with the revised plans or the compromise plans and the reduced award of attorney fees.

## DISCUSSION

### *Determination that the covenants emphasize height, not view*

The Committee placed much importance on the fact that the Days' proposed house would have a significant negative impact on the views from the Santorsolas' and other lot owners' houses. The trial court found that the Committee misinterpreted the covenants by reading them to emphasize view, not height. The Committee argues that the trial

---

[8] Clerk's Papers (CP) at 1461.

[9] CP at 1469.

court erred and that it was entitled to reject the plans based on view impact.

In a bench trial where the court has weighed the evidence, this court's review is limited to determining whether substantial evidence supports the trial court's findings of fact and whether the findings of fact support the trial court's conclusions of law.[10]

With regard to the issue of whether the covenants emphasize height, not view, the trial court found:

4. The Covenants provide that no building shall be erected, placed or altered on the tract until building plans, specifications and plot plans showing the location of the building shall have been approved in writing by the Committee as to all conditions of design and construction, and particularly as to height and as to conformity and harmony of external design with the existing structures on the above described property, and as to location of the building with respect to topography and finished ground elevation. These provisions stress height, not view.

5. The Covenants also restrict the height of structures on lots to no more than two stories in height "as limited by the power of the Committee to limit the height of any structure in said premises." This language indicates that the drafters contemplated construction of large, even luxurious homes, but homes that were not too tall.

6. The Covenants also provide, on page 5, that trees and shrubs not be permitted to grow to a height exceeding 20 feet, or to any height that tends to block the view from other lots. This is the first and only reference in the Covenants that discusses the importance of height with respect to view.[11]

In a conclusion of law, the court states:

6. The drafters of the Covenants placed importance on the height limitations expressly established by the Covenants. The language used in the Covenants emphasizes height, not view, and indicates that the Covenants were intended to prohibit

---

[10] *Ridgeview Props. v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982); *State ex rel. Coughlin v. Jenkins*, 102 Wn. App. 60, 63, 7 P.3d 818 (2000).

[11] CP at 1443.

what one might characterize as a giant home, or a skyscraper, or a tall commercial building structure.[12]

"The interpretation of the language in restrictive covenants is a question of law."[13] The primary goal in interpreting covenants that run with the land is to determine the intent or purpose of the covenants.[14] Extrinsic evidence may be relevant in determining that intent, when the extrinsic evidence gives meaning to words used in the covenant.[15]

The trial court was correct in finding that the only reference to view in the covenants is with respect to the heights of trees and shrubs. With respect to houses, the covenants state only that they may be no more than two stories in height "as limited by the power of the committee to limit the height of any structure in said premises."[16] This last clause does not state the grounds on which the Committee may impose a height limitation, nor does it specifically state that view may be a ground. Had the developer intended to make view a specific consideration with respect to the permissible height of houses, it could have included a provision similar to the one regarding the height of shrubs and trees.

The record contains no direct evidence regarding the intent of the developer in drafting the covenants. The trial court properly considered extrinsic evidence of the way the Committee interpreted and applied the covenants in reviewing and approving previous lot owners' proposed build-

---

[12] CP at 1461.

[13] *Mariners Cove Beach Club, Inc. v. Kairez*, 93 Wn. App. 886, 890, 970 P.2d 825 (1999).

[14] *Riss v. Angel*, 131 Wn.2d 612, 621, 934 P.2d 669 (1997) (rejecting the argument that free use of land is the paramount consideration in construing restrictive covenants).

[15] *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999). Some types of extrinsic evidence may not be admitted, namely, evidence of a party's unilateral or subjective intent as to the meaning of a contract or term; evidence that would show an intention independent of the instrument; and evidence that would vary, contradict, or modify the written word. *Id.*

[16] Ex. 42, at 4.

ing plans. Some of the court's findings with respect to this evidence are unchallenged and are therefore verities on appeal.[17]

With respect to the Committee's approval of the Santorsolas' building plans in 1997, the trial court found, in unchallenged findings, that the Committee did not engage in much investigation about the impact of the proposed home on the views of uphill property owners.[18] One uphill neighbor testified that the extent of the Committee's investigation was to bring the Santorsolas' plans to his house and "look[] at the situation from his home."[19] Another uphill neighbor testified that the Committee did no investigation of view impact on his home. And, as a result of building the Santorsolas' house, this neighbor lost the views from the first floor of his house and was left with a "sliver of a view" from a second floor bedroom and an obscured view from another second floor bedroom.[20] Substantial evidence supports the trial court's characterization of the view impact of the Santorsolas' house on this neighbor's view as "significant."[21] When this neighbor objected during construction of the Santorsolas' house, a member of the Committee told him that the home complied with the covenants because it was two stories high and located within the setback requirements. The Committee took no action in response to the neighbor's concerns about view impact.

The Committee later approved plans for another house, the Davenport-Yeater house, which was two stories tall and had a daylight basement. The height of the house with respect to the ridgeline was higher as constructed than as

---

[17] *See Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

[18] We reject, as unsupported by the record, the Santorsolas' argument that their house was the only one that impacted other homeowners' views.

[19] CP at 1444.

[20] CP at 1445.

[21] CP at 1445.

promised by the owners. The trial court found that this house had "some impact on view."[22]

The record supports the trial court's findings and conclusions that view preservation is not the primary purpose of the covenants. The strongest evidence of this is the Committee's prior approval of plans that called for houses that would impact other homeowners' views. The covenants clearly state that a house can be up to two stories high. The record does not show that the Committee ever exercised its authority to limit a house to fewer than two stories, even if the house impacted views. Substantial evidence supports the trial court's finding that the covenants emphasize height, not view.

*Unreasonable and bad faith rejection of the Days' plans*

The next issue is whether the Committee's rejection of the Days' proposed plans was unreasonable and in bad faith. "[C]ovenants providing for consent before construction or remodeling will be upheld so long as the authority to consent is exercised reasonably and in good faith."[23]

In addition to concluding that the Committee acted unreasonably and in bad faith by emphasizing views instead of height, the trial court's findings of fact describe additional reasons that support its conclusion that the Committee acted unreasonably and in bad faith in rejecting the Days' plans. The Committee challenges several of the court's findings and conclusions with respect to this issue.

The trial court concluded that, rather than independently evaluate the Days' proposed plans, the Committee relied on investigations performed by the Santorsolas. One example was a pole and balloon structure the Santorsolas built to demonstrate the impact of the Days' proposed house. The trial court found that the structure was inaccurate and misleading and overstated the impact of the house on the Santorsolas' views.

---

[22] CP at 1446.

[23] *Riss*, 131 Wn.2d at 625.

The Committee does not dispute that it used information prepared by or for the Santorsolas rather than information gathered from its own independent investigation. But it argues that the information it relied on accurately depicted the impact of the Days' proposed house on the Santorsolas' views. The Committee does not, however, challenge the trial court's finding that it "did not at any point evaluate or review the accuracy of the pole and balloon structure."[24]

The Santorsolas' views were the paramount concern of the Committee throughout the entire process. As the trial court found, the Committee's reliance on information supplied by the Santorsolas, without independently verifying its accuracy, is unreasonable because of their interest in protecting the views from their house. The Committee should have conducted an independent investigation of the impact on the Santorsolas' views in order to obtain unbiased, objective information about the view impact.[25]

Other evidence supports the trial court's conclusion that the Committee's investigation was unreasonable and in bad faith. For instance, Mr. Day testified that no member of the Committee ever told him that the Committee actually measured the heights of the Santorsolas' and others' houses and compared those heights to the height of the Days' proposed house. Dr. Heimbach, a member of the Committee, also testified that the Committee did not measure other houses to compare their heights with the height of the Days' proposed house.

The trial court found, in an unchallenged finding, that the Days' architect informed the Committee by letter that the proposed house needed to have a 98-foot main floor elevation in order to provide drainage. The trial court found in another unchallenged finding that the Committee failed to respond to this information and continued to complain that the Days' proposed house was too high.

---

[24] CP at 1451.

[25] Also, as discussed, relying solely on view impact in rejecting the Days' plans was unreasonable.

In *Riss v. Angel*,[26] the court concluded that the Board's investigation of the lot owner's proposed plans was inadequate. The Board in *Riss* did not visit the site, relied on inaccurate and misleading evidence, and made no objective comparisons of existing homes and the proposed home with respect to size and height, even though size and height were the primary reasons the plans were rejected. As in *Riss*, the trial court here properly concluded that the Committee's investigation was inadequate.[27]

The Committee also argues that the trial court erred by determining that it acted unreasonably and in bad faith by concluding that the Days' proposed house consisted of three stories, specifically that the daylight basement constituted a story.[28] Substantial evidence supports the trial court's finding. In its review and approval of the plans for the Gruhns' proposed house in December 1998, the Committee relied on an opinion solicited from its lawyer that if the floor of a house is substantially below ground, it is a basement, not a story. Using this definition of "story," the Committee approved the Gruhns' plans for a two-story house with a daylight basement that raised the main floor of the house by two feet.[29] The Committee also approved plans for another house, the Davenport-Yeater house, that is a two-

---

[26] 131 Wn.2d 612, 934 P.2d 669 (1997).

[27] The Committee implies that its investigation was reasonable because the Days turned down its suggestion that they hire an architect to evaluate their plans and the Committee's concerns about view and to propose design changes. There is nothing in the covenants requiring a lot owner to accept the Committee's suggestions about hiring an architect or making a lot owner's rejection of this suggestion a ground to find the Committee's investigation reasonable.

[28] In a conclusion of law, the court states: "[T]he Committee's decision to disapprove the Days' Original Plans based on the Committee's conclusion that the Days' proposed daylight basement was a 'story' was unreasonable and was not made in good faith." CP at 1465.

[29] The Gruhns were forced to revise their building plans after the Santorsolas strenuously objected to the Gruhns' original plans that called for a house which, in the trial court's words, would have had a "profound impact" on the Santorsolas' views. CP at 1447. In an unchallenged finding, the court found: "The Committee approved the Gruhns' plans because the Gruhns negotiated with the Santorsolas and changed their original house plans in order to satisfy the concerns expressed by the Santorsolas. The Gruhns informed the Days that they were unhappy about the pressure they got from the Santorsolas." CP at 1450.

story house with a daylight basement, and it approved plans for the Heimbach house, which had a loft over the kitchen and was three levels high. But, when it subsequently considered the Days' plans, the Committee for the first time used the definition of "story" from an architectural dictionary supplied by Santorsola and determined that a daylight basement does constitute a story. This evidence supports the trial court's findings of fact, which, in turn, support the trial court's conclusion that the Committee's decision to disapprove the Days' original plans because the daylight basement constituted a story was unreasonable and not made in good faith.

Next, the Committee challenges the trial court's conclusion that Santorsola's refusal to recuse herself was improper and a breach of the Committee's duty to act in good faith. The court concluded:

> Julie Santorsola's property, views, and enjoyment of her home were directly and adversely affected by the building plans submitted by the Gruhns and the Days and she could not appropriately consider either set of plans as a Committee member consistent with her duty to act in good faith.[30]

The Committee argues that the trial court's standard for recusal is contrary to law, citing *Heath v. Uraga*.[31] In *Heath*, the restrictive covenants provided for a three-member committee to review building plans for lots within a subdivision. At the time lot owner Uraga submitted plans for a house, the Committee consisted of only one member, Heath, who owned a lot uphill from Uraga's. Uraga did not raise the issue of recusal when Heath refused to approve his plans. The only mention by the court about a conflict of interest is in a footnote, where the court noted that the covenants did not bar appointing a homeowner whose view might be affected by the proposed plan, particularly where finding lot owners willing to serve on the Committee was difficult.

---

[30] CP at 1466.

[31] 106 Wn. App. 506, 24 P.3d 413 (2001), *review denied*, 145 Wn.2d 1016 (2002).

Here, unlike in *Heath*, the trial court's findings of fact support the court's conclusion that Santorsola could not properly consider the Days' proposed plans. It is clear from the record that Santorsola was adamantly opposed to any construction on Lot 14 that would impact her views, especially because previous approval and construction of the Gruhns' house had a negative impact on her views. The Santorsolas undertook significant efforts to influence the building plans for Lot 14. The record makes it clear that Julie Santorsola was not, and could not be, an objective Committee member when it came to consideration of the Days' plans. The trial court's findings on this issue are supported by substantial evidence, and the findings support its conclusions.

Next, the Committee challenges the trial court's conclusion that it acted unreasonably in "abdicating its decision-making authority to the Santorsolas."[32] The trial court concluded:

> Abdication of the construction approval decision to other homeowners is not a reasonable exercise of the Committee's responsibility to review and act upon proposed building plans. It is also unreasonable for the Committee to require people who request the Committee's approval of building plans to negotiate with neighbors to the point of satisfying their neighbors.[33]

The Committee characterizes this conclusion as saying that it acted unreasonably merely because it asked the Days to "talk" to their neighbors.[34]

This is a mischaracterization of the court's conclusion. The court determined that it was unreasonable for the Committee to withhold its approval of the Days' plans unless and until the Santorsolas were satisfied. Both Mr. Day and his builder, Devon Hughes, testified that the Committee told them that the Santorsolas' approval of the Days' plans was a prerequisite to the Committee's approval

[32] CP at 1468.

[33] CP at 1468.

[34] Br. of Appellant at 38.

of them. This is unreasonable because the covenants vest plan approval in the Committee and do not require the Committee to obtain the approval of neighbors. And, lack of approval of neighbors is not a ground upon which the Committee can properly reject plans.

Next, the Committee challenges the following conclusion of law:

> [T]he Committee's failure to provide the Days with the comments, correspondence, or expert opinions the Committee received from other homeowners regarding the Days' plans is unreasonable. The Committee's failure to provide the Days with a meaningful opportunity to respond to the information submitted to the Committee before the Committee acted on the Days' plans is also unreasonable.[35]

The Committee makes conclusory arguments, without citation to authority or to the record, that the Committee did communicate neighbors' concerns to the Days and that the Days had the opportunity to respond.

However, an unchallenged finding of fact states that the Santorsolas presented a videotape at the May 31, 1999 Committee meeting and that the videotape was not provided to the Days. Another unchallenged finding states that the Committee never provided the Days with a copy of the letter the Santorsolas' architect wrote after reviewing the design of their proposed house. Also, Mr. Day testified that the Santorsolas constructed a pole and balloon structure on the Days' lot without the Days' knowledge or permission. Mr. Day also testified:

> Q Prior to the Committee sending you Exhibit No. 9 [the June 11 rejection letter], did Doctors Heimbach, Barnebey or Mrs. Santorsola contact you or your wife and ask you to come before the Committee to answer any concerns or questions they may have had regarding your original plans?
>
> A No. We met with the Santorsolas. We did not, during that period, meet with the rest of the Committee. I don't remember

---

[35] CP at 1467.

if they asked us to or not. I just don't remember that. But we did meet with the Santorsolas during that time period.

Q Prior to the Committee sending you Exhibit 9, the June 11 rejection letter, did the Committee give you an opportunity to respond in writing or with other documentation or with testimony, if you will, from your architect to address the concerns that were raised in Exhibit 9?

A. No. There was [sic] no opportunities whatsoever to answer questions, to rebut points brought up by others. In fact, at this time, we didn't know that there was a lot of politicking going on here against our house. We didn't know that this was going on. We didn't find this until later.[36]

This evidence supports the trial court's conclusion that the Committee acted unreasonably in failing to communicate with the Days.

The Committee's next challenge pertains to a June 30, 1999, letter the Days sent to the Committee. In the letter, the Days addressed the reasons why the Committee rejected their original plans. The Days submitted the letter along with the revised plans.

At their depositions, the Committee members testified that they received the Days' letter on June 30, 1999, the same day they received the Days' revised plans. At trial, however, the Committee members testified that they did not receive the letter until the Committee's October 4, 1999, meeting. The trial court concluded:

[T]he Committee members' trial testimony to the effect that they did not receive Mr. Days' [sic] June 30 letter, which was submitted with the Revised Plans, until October 1999 is contradicted by their deposition testimony, is not credible, and raises doubt about the reasonableness and good faith of the Committee's actions with respect to the Days and their building plans.[37]

The Committee argues that the timing of the receipt of the letter is irrelevant because the Days and the Committee

---

[36] Report of Proceedings (RP) (Oct. 22, 2001) at 79-80.

[37] CP at 1466.

discussed the matters addressed in the letter during a June 19, 1999, meeting. Even if this is true, we will not disturb the court's conclusion. The trial court is entitled to make credibility determinations[38] and, in light of its finding that the testimony was not credible, the court was entitled to conclude that this raised doubts about the Committee's good faith and reasonableness.

The Committee next challenges the court's conclusion that its rejection of the Days' revised plans was unreasonable because the rejection letter includes additional reasons not considered when the Committee rejected the Days' original plans. But, the court concluded that the rejection of the revised plans was unreasonable because the letter contains inaccurate information regarding the orientation of the Days' proposed residence that the Committee did not verify.

Substantial evidence supports the trial court's conclusion. When it rejected the Days' original plans, the Committee listed four reasons for its decision (size of the garage, violation of setback lines, three rather than two stories, and view blockage). The Days' revised plans corrected two of the reasons. In the June 30 letter accompanying the revised plans showing a two-story house with a daylight basement, the Days explained that the third reason—that the proposed house was three stories—was incorrect, particularly in light of the Committee's previous approval of two-story houses with daylight basements.[39] There is nothing in the record to show that the Committee undertook an independent investigation with regard to the revised plans. Rather, the record shows that it relied on the Santorsolas and deferred to their opinions of the proposed construction and whether the proposed house would impact the Santorsolas' views.

---

[38] *See Westby v. Gorsuch*, 112 Wn. App. 558, 570, 50 P.3d 284 (2002) (credibility determinations are for the trier of fact), *review denied*, 149 Wn.2d 1008 (2003).

[39] The fourth reason was view blockage. As discussed, the Days disputed that the purpose of the covenants was to protect views.

Finally, the Committee challenges the trial court's conclusion that the Committee's rejection of the Days' compromise plans was unreasonable.[40] It argues that its rejection was proper because the compromise plans were not really plans at all. The Committee argues, it was merely a "take it or leave it" demand.

Again, the court's findings of fact on this issue are supported by substantial evidence, and the findings support the court's conclusion. The Days submitted plans in July 2000 for a smaller house than shown in the revised plans and reduced the height of the house by six feet. Mr. Day described the impact on the Santorsolas' views if the house were built according to the compromise plans:

Q So let's take the second floor first. What would have been the impact to the Santorsolas' view if you had been allowed to construct your home under the compromise plans?

A With a ridge line of 119, they would have seen the lake, Bellevue, the foothills, Rainier, got the whole ten yards.

Q With respect to the first floor, had the Committee allowed you to build your home pursuant to the compromise plans, what would have been the impact on the Santorsolas' view?

A Again, over the garage, they continue to see the lake and Bellevue. And over the two-story portion of the house, the 119 ridge line, they see Mount Rainier. The ridge line would be right at about the base of Mount Rainier. So the mountain in its entirety would be visible above the house at 119.[41]

The Committee fails to offer a valid reason for its rejection of the compromise plans. The evidence supports the trial court's conclusion that the Committee's failure to approve

---

[40] "The Committee's August 6 rejection was unreasonable because (1) the Committee was provided with the information they requested in April; namely, another proposal from the Days and (2) the Days' Compromise Plans included their proposal to reduce the height of the house by 6 feet, which the Committee informed the Days in October 1999 it would accept. Instead of considering this Compromise modifications [sic] and its previous requirement of a height reduction of between 2 to 6 feet, the Committee simply demanded new detailed plans, which it knew from its experience with the Gruhns was an expensive proposition." CP at 1468-69.

[41] RP (Oct. 22, 2001) at 137.

the compromise plans was unreasonable and not in good faith.

*Exclusion of evidence*

The Committee argues that the trial court erred by not admitting a computer graph and three-dimensional visualizations prepared by an architect that depicted the size of the Days' proposed house and its impact on views from the Gruhns' and the Santorsolas' houses.

██ The trial court's discretion with respect to evidentiary matters is broad.[42] We will reverse a decision of the trial court only if the court abuses its discretion.[43] "Discretion is abused if it is based on untenable grounds or for untenable reasons."[44]

██ The trial court ruled that the architect's graphs and visualizations were not admissible because the Committee was late in disclosing them.[45] The trial court's oral opinion explains the court's reasons and shows that the court's decision not to admit this evidence was not an abuse of discretion:

> However, with regards to Exhibit 95, which is apparently Mr. DePape's illustrative exhibits to explain his testimony about the impact of the Days['] home, this is an area where relevancy and the rules of discovery run head long into each other.
>
> On the one hand, it's clear those exhibits are going to be relevant and very important to the issues before the court.
>
> But that's not the only issue before the court. Trials are not by ambush in our civil system. They are hearings that are carefully prepared for by both sides. And we try to afford both sides a fair opportunity to prepare.

---

[42] *Cox v. Spangler*, 141 Wn.2d 431, 439, 5 P.3d 1265 (2000).

[43] *Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640, 662-63, 935 P.2d 555 (1997).

[44] *In re Parentage of J.H.*, 112 Wn. App. 486, 495, 49 P.3d 154 (2002), *review denied*, 148 Wn.2d 1024 (2003).

[45] *See In re Marriage of Gillespie*, 89 Wn. App. 390, 404, 948 P.2d 1338 (1997) (the trial court has the authority to exclude evidence offered by or testimony of a witness where the witness is not disclosed until just before trial). King County Local Rule 26 requires disclosure of possible lay and expert witnesses by the date set out in the case schedule.

In this case where the plaintiff learned of the illustrative photographs at the deposition which was conducted only a short time ago, barely a week ago, and the illustrative exhibits are clearly based on, among other things, computer programs which the plaintiff cannot examine at this late date, and fairly read interrogatory 21 and considering requests for production asked for precisely this type of exhibit long, long ago, back in December of 2000, I have both a violation of the discovery requirements, because that interrogatory and request for production was never supplemented with Mr. DePape's proposed illustrative exhibits.

Nor can I say that there's not prejudice here. In fact, it seems there's overwhelming prejudice to the plaintiffs in the sense that the plaintiff cannot prepare to meet this evidence at this late date.[46]

Moreover, DePape testified about his opinion on the size and impact of the Days' proposed house. The trial court did not abuse its discretion by excluding the evidence.

*Trial court's judgment specifying height and roof pitch*

The Committee argues that the trial court improperly substituted its judgment for that of the Committee by ordering that the Days could build a house with a maximum roof height of 118 feet and maximum roof pitch of 4 feet by 12 feet. The Committee contends that the trial court should have remanded to the Committee with directions to conduct future plan reviews in accordance with the trial court's decision. The Days argue in their cross-appeal that the court should have ordered that they can build their house as proposed in either the revised plans or the compromise plans.

The Court in *Riss*, after finding that the homeowners' association's rejection of an owner's proposed plans was unreasonable and arbitrary, affirmed the trial court's judgment that the lot owners could build their home as proposed, with a modification of the proposed exterior finish. Here, because the trial court found that the Committee's rejection of the Days' revised plans and compro-

---

46 RP (Oct. 22, 2001) at 19-21.

mise plans was unreasonable and in bad faith, it follows that the Days should have been entitled to build their house in accordance with one of those two plans. We therefore reverse the trial court's imposition of the height and roof pitch limitations and remand for entry of a judgment stating that the Days are entitled to construct a house in accordance with either the revised plans or the compromise plans.

## Attorney fee award

The trial court concluded that the Days were prevailing parties and therefore entitled to an award of attorney fees. The Committee argues that this was error because the Days did not prevail on their claim for damages and because the Committee prevailed on other matters, such as whether it must approve the revised or compromise plans.

The trial court's award of fees is appropriate under the attorney fee provision in the covenants, but the covenants do not use the "prevailing party" language. Specifically, the covenants provide in part:

> The provisions of this instrument may be enforced by any owner of any property included in said subdivision . . . upon the violation or attempt to violate any of the provisions hereof, by any proceeding at law or in equity either to prevent him or them from such violation or to recover damages arising from such violation; and in the event a successful action is instituted by any person, the person or persons instituting such action shall be entitled to their costs incurred, together with a reasonable attorney's fee to be fixed by the Court. [47]

The issue under the covenants is whether the Days' lawsuit was a "successful action." It is reasonable to apply by analogy case law construing "prevailing party" to determine whether the Days were successful. Under that case law, the trial court's conclusion was correct.

In *Riss*, the covenants provided that the prevailing party was entitled to an award of attorney fees. Generally, the prevailing party is the party who receives an affirmative

---

[47] Ex. 42, at 2.

judgment in his or her favor.[48] "If neither wholly prevails, then the determination of who is a prevailing party depends upon who is the substantially prevailing party, and this question depends upon the extent of the relief afforded the parties."[49] Although the plaintiffs in *Riss* were awarded delay damages in addition to a judgment declaring that they could build their proposed house, provided they changed the exterior finish, the court, in determining the plaintiffs were the prevailing parties, stated only: "Plaintiffs will essentially be able to build the house they sought to have approved. The trial court correctly concluded that that [sic] Plaintiffs are prevailing parties."[50]

As in *Riss*, the trial court allowed the Days to build a house nearly in accordance with the house they sought to have approved. The Days were thus the substantially prevailing parties and their action can fairly be called "successful" even though they did not prevail on their claim for damages. The trial court properly awarded them attorney fees pursuant to the attorney fee provision in the covenants.

In their cross-appeal, the Days argue that the trial court erred by not awarding them all the attorney fees they requested. The Days requested $156,369.26 in attorney fees. The final judgment awards the Days $97,362 in attorney fees. There is a handwritten, parenthetical notation after the amount that says: "The Court having deducted the $7,327 identified by defendants."[51]

■ The Supreme Court has held that: "the absence of an adequate record upon which to review a fee award will result in a remand of the award to the trial court to develop such a record"[52] and "findings of fact and conclusions of law

---

[48] *Riss*, 131 Wn.2d at 633.

[49] *Riss*, 131 Wn.2d at 633.

[50] *Riss*, 131 Wn.2d at 634.

[51] CP at 1439.

[52] *Mahler v. Szucs*, 135 Wn.2d 398, 435, 957 P.2d 632 (1998).

are required to establish such a record."[53] The findings of fact and conclusions of law must set forth the manner in which attorney fees were computed.[54]

Here, the record does not contain an indication of how the trial court determined the amount of the fee award, nor does it contain findings of fact or conclusions of law explaining how the court arrived at its award of $97,362. Review of the Days' claimed error concerning the amount of the award is therefore not possible. Accordingly, we remand the attorney fee award for the entry of findings of fact and conclusions of law.

*Request for attorney fees on appeal*

The Days are the substantially prevailing parties on appeal. Accordingly, we grant their request for an award of attorney fees on appeal.[55]

## CONCLUSION

We affirm the trial court's interpretation of the covenants and its conclusion that the Committee acted unreasonably and in bad faith by rejecting the Days' revised and compromise plans. We reverse the court's imposition of the height and roof pitch limitations and remand for entry of a judgment that states that the Days can construct a house on Lot 14 pursuant to either their revised plans or their compromise plans. We remand for the entry of findings of fact and conclusions of law setting forth the manner in which the attorney fee award was computed. We grant the Days' request for an award of attorney fees on appeal. The Days are directed to comply with RAP 18.1(d).

BECKER, C.J., and KENNEDY, J., concur.

Review denied at 151 Wn.2d 1018 (2004).

[53] *Mahler*, 135 Wn.2d at 435.

[54] *Svendsen v. Stock*, 143 Wn.2d 546, 560, 23 P.3d 455 (2001).

[55] *See Hwang v. McMahill*, 103 Wn. App. 945, 954, 15 P.3d 172 (2000) (a party is entitled to an award of attorney fees on appeal if a contract, statute, or recognized ground of equity permits recovery of attorney fees at trial and the party is the substantially prevailing party on appeal).