[No. 57192-3-I.   Division One.   April 23, 2007.]

DAVID BAUMAN ET AL., *Respondents*, v. RONALD TURPEN ET AL., *Appellants*.

---

[34] 119 Wn.2d 724, 837 P.2d 1000 (1992).

*Tatyana A. Gidirimski* and *James A. Oliver* (of *Short Cressman & Burgess, PLLC*) and *David A. Herrman* (of *Bucklin Evens, PLLC*), for appellants.

*Peter L. Buck, Kitteridge Oldham, Heather J. Pearce,* and *Molly A. Lawrence* (of *Buck & Gordon, LLP*), for respondents.

¶1 AGID, J. — In April 2004, David and Carole Bauman filed a complaint against Ronald and Lauren Turpen to enforce a deed restriction that limited any home built on the Turpens' property to "one story." The Turpens began constructing their home after the lawsuit was filed. The trial court granted the Baumans' motion for partial summary judgment, concluding that the 1949 covenant could not be interpreted by reference to the 1997 Uniform Building Code (UBC) or Seattle Building Code (SBC). After a three-day bench trial, the court found that the covenant was intended to preserve the views from neighboring homes and ordered the Turpens to abate the violation by modifying their roof. The court did not consider the hardship imposed on the Turpens by the abatement order because it found they were not innocent parties. The court later granted the Turpens' motion for reconsideration and modified the terms of the abatement. The Turpens challenge the trial court's orders on numerous grounds. The Baumans cross-appeal the order amending the abatement.

¶2 Because the trial court must construe restrictive covenants by discerning the intent of the drafter, it correctly concluded that the 1997 UBC and SBC did not assist in construing the 1949 deed restriction. Extrinsic evidence may be used to determine the intent of the drafter. Here, the trial court considered the topography of the neighborhood and the language of other restrictive covenants the drafter imposed on neighboring lots and decided that the one-story restriction was intended to preserve the views from neighboring homes. That evidence was relevant and probative and supports its decision that the restrictive covenant was designed to protect views from upland homes. Injunctive relief is a proper remedy for violations of restrictive covenants. Under Washington law, the Turpens were not entitled to ask the court to consider hardships to them because, by constructing their home after the lawsuit was

filed, they ceased being innocent defendants. Accordingly, the trial court could not modify its order based on the hardships the Turpens alleged on reconsideration. We affirm the original orders and reverse the order on reconsideration.

## FACTS

¶3 The Turpens and the Baumans own adjoining lots in west Seattle. Their neighborhood is built on a hill which slopes downward from east to west, providing western and northern views of Puget Sound and the Olympics. The Bauman lot is east of and uphill from the Turpen lot. These lots were part of a parcel formerly owned by George Gilbert, who divided his parcel into 12 lots, 5 of which were downhill (westerly) lots. He sold the lots one by one from the late 1940s to the early 1950s and recorded restrictive covenants on four of the five downhill lots. Gilbert built a 22-foot one-story home on the fifth downhill lot, but he did not sell the lot subject to a restrictive covenant. He placed no restrictions on the uphill lots.

¶4 In 1949, Gilbert recorded a covenant on the lot now owned by the Turpens that reads: "only one (1), one (1) story house with garage attached not less than five (5) rooms. House must be completed before occupancy." The deeds on three of the other downhill lots contained restrictive covenants that required owners to build single family residences. They also included restrictions that required either that new homes conform to other homes in the tract or be limited to one story.

¶5 In 1997, the Baumans purchased an uphill lot because of its sweeping panoramic views of the entire east-west expanse of Puget Sound. Some of these views were across the Turpen lot. Before they bought the lot, the Baumans studied the restrictive covenants in the Turpen deed and estimated the height of a future one-story home on this lot based on the heights of homes on adjacent lots that were 22 to 23 feet high.

¶6 On August 18, 1997, the Turpens purchased their lot and hired architect Mark Nelson to design their home. Nelson consulted the Seattle Department of Construction and Land Use (DCLU) about the definition of "one story." DCLU told him to follow the UBC.[1] On February 27, 1998, the Turpens received a letter from attorney Michael Warren, who represented several of their uphill neighbors, asking for copies of the plans for their home. Over the course of the next five years, the Turpens and their neighbors, including the Baumans, exchanged numerous letters about the plans.

¶7 On July 21, 1999, the Turpens applied for a building permit for a one-story house with a daylight basement, but DCLU concluded that the plans were for a two-story house as defined by the UBC. On July 3, 1999, the neighbors filed a complaint against the Turpens. They later dismissed the case because no building permit had been issued. At that time, Warren told the Turpens he would file suit again once the permit was issued. The Turpens redesigned their house and sent Warren a letter from DCLU which confirmed that their proposed home complied with the UBC as a one-story home. On August 31, 2000, Warren notified the Turpens in writing of his position that the current UBC did not apply to the covenant, which should be construed to achieve its purpose of protecting views. On June 19, 2002, DCLU issued a permit to the Turpens for a 2,900 square-foot home based on the redesigned plans. But rather than build that home, they hired Randall Munsen to redesign the structure. The Munsen design changed the roof line from a "gable end" to a "hip and ridge" design and increased the square footage to 5,071. On December 4, 2002, Warren notified the Turpens that in *Boyd v. Michaels*, a 1989 case brought under the neighborhood covenants, the trial court

---

[1] The parties stipulated at trial that the provisions of the 1997 UBC and the 1997 SBC that define a "one-story house" are identical.

defined the term "one story" as requiring new homes to conform to other homes in the district and the 1997 UBC.[2]

¶8 On March 16, 2004, DCLU issued a permit for a one-story house based on Munsen's design. The Baumans learned about this permit on April 9, 2004. On April 15, 2004, before construction began, the Baumans and two other neighbors, Robert and Susan Evans and Peter and Kaye Hutto, filed a complaint against the Turpens, seeking injunctive relief. On April 19, 2004, the Turpens hired a surveyor to set points for the "soldier pilings." Sometime after May 19, 2004, the Turpens poured a foundation and began construction.

¶9 On July 1, 2005, the trial court granted the Turpens' motion for summary judgment against plaintiffs Hutto and Evans but denied it as to the Baumans. On July 22, 2005, the trial court heard oral argument and granted the Baumans' motion for partial summary judgment, concluding that the meaning of the phrase "one story" in the 1949 covenant was not defined by the 1997 UBC and/or the 1997 SBC. The Turpens stopped construction on their home when this order was issued.[3]

¶10 After a bench trial, a different trial judge concluded that the purpose of the covenant was to preserve neighboring views and ordered the Turpens to abate or modify their roof. The October 3, 2005 order stated that "[a]n acceptable modification is a flat roof built on 2 foot trusses constructed on top of the existing wall plates. There is no requirement that the roof be multilevel or that the interior living space of the house be invaded." After trial, the Turpens moved for reconsideration. The trial court did not request a response

---

[2] King County Superior Court Cause No. 89-2-11423-2. At the preliminary injunction hearing in *Boyd,* the trial court stated:

> Taking a look at the language of the restriction, it says "One-story building (at least five rooms), with garage attached, built to conform with other homes in the district." End of covenant. It doesn't say built to please the neighbors. It doesn't say built to make everybody happy. It doesn't say built to preserve perfectly the views of the neighbors. . . . "

[3] By the time construction stopped, the Turpens had completed the framing, siding, and roof of their home.

from the Baumans. On October 19, 2005, it granted an order amending order stating:

> The Turpen house shall be abated or modified. An acceptable modification is a flat roof built on trusses ranging in height from 30 inches on the ends to 36¼ inches in the center, constructed on top of the existing wall plates. There is no requirement that the roof be multilevel or that the interior living space of the house be invaded.

The Turpens appeal the trial court's July 22 and October 3 orders. The Baumans cross-appeal challenges the October 19 order amending order.

## DISCUSSION

*July 22, 2005 Partial Summary Judgment Order*

¶11 On July 22, 2005, the trial court granted the Baumans' partial summary judgment motion, concluding that the term "one story" could not be defined by the 1997 UBC and/or the 1997 SBC. The Turpens challenge this order, arguing the term should be interpreted by its ordinary and usual meaning and the court should have applied the 1997 UBC and/or the 1997 SBC.

¶12 The primary goal in interpreting covenants that run with the land is to determine the drafter's intent and the purpose of the covenant at the time it was drafted.[4] Interpretation of a restrictive covenant is a question of law we review de novo.[5] Neither the 1997 UBC nor the 1997 SBC was in effect when Gilbert drafted the "one story" covenant that restricts building on the Turpen lot. The trial court could not define the intent or purpose of a covenant drafted in 1949 by these later-enacted codes. Its ruling on summary judgment was correct.

---

[4] *Riss v. Angel*, 131 Wn.2d 612, 621, 934 P.2d 669 (1997) (rejecting the argument that free use of land is the paramount consideration in construing restrictive covenants).

[5] *Day v. Santorsola*, 118 Wn. App. 746, 756, 76 P.3d 1190 (2003) (quoting *Mariners Cove Beach Club, Inc. v. Kairez*, 93 Wn. App. 886, 890, 970 P.2d 825 (1999)), *review denied*, 151 Wn.2d 1018 (2004).

■ ¶13 The Turpens also argue the trial court should have followed the superior court's earlier decision in *Boyd*, which found that the meaning of the term "one story" was not to perfectly preserve the views of the neighbors but as defined by the then-current UBC to conform with other homes in the district.[6] Even though *Boyd* concerned the same subdivision and was decided by the same court, the trial court here could properly disregard it because the findings of fact and conclusions of law of a superior court are not legal authority and have no precedential value.[7]

*Use of Extrinsic Evidence To Interpret Restrictive Covenants*

■ ■ ¶14 In a bench trial where the court has weighed the evidence, our review is limited to determining whether substantial evidence supports the trial court's findings of fact and whether those findings support the court's conclusions of law.[8] Issues of law are reviewed de novo.[9]

¶15 On October 3, 2005, after a bench trial on the merits, the court determined that:

3. Using the building code definition of "one story" would not effectuate [the grantor's] intent. The code defines which level constitutes the first story but does not limit the height of that story except as the overall height is controlled by the zoning ordinance. If houses on the lower lots were built as high as the zoning ordinances allowed, then the views from the upper lots would be lost entirely.

4. The best evidence of George Gilbert's intent is the house that he constructed on one of the lower lots just prior to placing the deed restriction on the remaining lower lots.

5. The Gilbert house was built in a manner that preserved the view of Puget Sound from the uphill lot to the east. The

---

[6] King County Superior Court Cause No. 89-2-11423-2, Ex. 10, at 3.

[7] *See Tunstall v. Bergeson*, 141 Wn.2d 201, 224, 5 P.3d 691 (2000), *cert. denied*, 532 U.S. 920 (2001).

[8] *Day*, 118 Wn. App. at 755 (citing *State ex rel. Coughlin v. Jenkins*, 102 Wn. App. 60, 63, 7 P.3d 818 (2000)).

[9] *State v. Johnson*, 128 Wn.2d 431, 443, 909 P.2d 293 (1996).

Turpens' house is immediately north of the original Gilbert house and slightly downhill on its east side yet the east side of the Turpen roof is higher than the Gilbert's. Thus it is clear that the Turpen house presents substantially more view blockage [than] the house constructed by the maker of the deed restriction.

¶16 The Turpens argue their deed restriction does not mention view preservation or a height restriction and assert the trial court erred as a matter of law by construing intent not found in the covenant's express language. They also assert the trial court made an error of law by failing to apply the objective manifestation theory of contracts and improperly considering extrinsic evidence to determine the grantor's intent. Had Gilbert intended to preserve the views, they argue, he would have imposed a height restriction or included express language to that effect in the covenant. They also argue that Gilbert did not intend that the restriction preserve neighboring views because he did not impose a restrictive covenant on the lot on which he built a house and later sold without a deed restriction requiring conformity with other houses in the area. Relying on our holding in *Day v. Santorsola*, they also contend the lack of direct evidence of Gilbert's intent destroys the Baumans' claim that the purpose of the covenant was to preserve uphill owners' views.[10] The Baumans argue the trial court's conclusion was based on substantial evidence that Gilbert intended to preserve the views because he placed building restrictions only on the downhill lots and built a one-story, 22-foot home on the only unrestricted downhill lot.

¶17 The recognized principles for construing covenants are set forth in *Burton v. Douglas County*.[11] Courts are to determine the drafter's intent by examining the clear

---

[10] 118 Wn. App. 746, 756, 76 P.3d 1190 (2003), *review denied*, 151 Wn.2d 1018 (2004).

[11] 65 Wn.2d 619, 621-22, 399 P.2d 68 (1965).

and unambiguous language of a covenant.[12] We must consider the instrument in its entirety and, when the meaning is unclear, the surrounding circumstances that tend to reflect the intent of the drafter and the purpose of a covenant that runs with the land.[13] While the interpretation of a restrictive covenant is a question of law, intent is a question of fact.[14] Extrinsic evidence of intent is admissible if relevant to interpreting the restrictive covenant. In *Hollis v. Garwall, Inc.*, the Supreme Court applied the *Berg v. Hudesman*[15] context rule to interpreting restrictive covenants.[16] Under this rule, evidence of the "surrounding circumstances of the original parties" is admissible "to determine the meaning of the specific words and terms used in the covenants."[17] That is precisely what the trial court did here.

¶18 Our decision in *Foster v. Nehls*[18] supports the trial court's reliance on extrinsic evidence to conclude that the one-story restriction was intended to preserve neighboring views. In *Foster*, we upheld the trial court's use of extrinsic evidence to find the grantor's intent in using the term "one and one-half stories" in a restrictive covenant.[19] Here, as there, extrinsic evidence was necessary to define the operative term because it " 'was not defined either with reference to any building code or inches and feet measurement.' " Thus, the trial court properly considered evidence of neighborhood topography and what limits the grantor

---

[12] *Id.*

[13] *Lenhoff v. Birch Bay Real Estate, Inc.*, 22 Wn. App. 70, 72, 587 P.2d 1087 (1978).

[14] *Day*, 118 Wn. App. at 756 (quoting *Mariners Cove Beach Club*, 93 Wn. App. at 890); *Foster v. Nehls*, 15 Wn. App. 749, 750-51, 551 P.2d 768 (1976), *review denied*, 88 Wn.2d 1001 (1977).

[15] 115 Wn.2d 657, 663, 801 P.2d 222 (1990).

[16] *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999) (citing *Riss*, 131 Wn.2d at 623).

[17] *Id.* at 696.

[18] 15 Wn. App. 749, 551 P.2d 768 (1976), *review denied*, 88 Wn.2d 1001 (1977).

[19] *Id.* at 751.

placed on his own house to decide what "one story" meant to him when he wrote it.

¶19 Our holding in *Day* does not help the Turpens because it was not based solely on the absence of evidence of the drafter's intent. The covenants in *Day* restricted homes within the community from exceeding two stories and limited the height of bushes and shrubs to either a maximum of 20 feet or a height that would not block the view from other tracts.[20] We held that the record in *Day* supported the trial court's findings and conclusions that view preservation was not the primary purpose of the two-story restriction because the drafter expressly limited the height of vegetation to preserve the views but did not include similar language in the home restrictions. In addition, the subdivision committee in *Day* had not previously interpreted the two-story restriction as a view-protection device.[21]

¶20 The evidence here is entirely different from that in *Day*. The restrictive covenant on the Turpens' lot reads: "[o]nly one (1), one (1) story house with garage attached not less than five (5) rooms. House must be completed before occupancy." Of the six downhill lots he created, Gilbert imposed the "one story" restriction on three, required that new homes built on two others confirm to other buildings in the neighborhood, and built his own 22-foot, one-story home on the other.

¶21 Before entering its findings of fact and conclusions of law, the trial court heard three days of testimony, reviewed over 200 exhibits, and visited the area, including the Bauman and Turpen homes. The record supports the trial court's decision that neighborhood conformity and view preservation were the concerns Gilbert sought to address in imposing restrictive covenants on the downhill lots. The current building code definition of "one story" would not effectuate Gilbert's intent because it addresses neither of

---

[20] *Day*, 118 Wn. App. at 749-50.

[21] *Id.* at 757.

those concerns. It allows the Turpens to build a much larger house that blocks a significant part of their uphill neighbor's view because height and bulk are restricted only by the zoning of the property, not the building code.

¶22 The Turpens argue that the view preservation is a subjective, vague standard and the Baumans' expectation that their view would remain unobstructed is unreasonable. We disagree. Preservation of neighboring views is a recognized interest and is not per se unreasonable.[22] Rather, as we have indicated in our holding in *Foster*, covenants preserving views will be upheld when substantial evidence supports them.[23] The findings here are supported by substantial evidence, and the court's conclusions are properly drawn from those findings.

*Findings of Fact*

¶23 In its October 3, 2005 order, the trial court made two central findings about the Turpen home and its impact on the Baumans' view:

> 13. The Turpen house has three floor levels. It has a lower level with three bedrooms, a utility room, a storage room, and a recreation room. It has a mid floor level with a kitchen, a nook, dining room, living room and a family room. It has an upper level with a[n] entry area and hall, a bedroom, a large closet, a bathroom, a guest closet and a guest powder room. At approximately 5000 square feet it is considerably larger than the surrounding homes.
>
> . . . .
>
> 15. The view lost by the Baumans is caused by the top 10 to 14 feet of the Turpen house. The westerly view from the Bauman house is directly across the Turpen roof. In that direction from the main outside deck, the water of Puget Sound and the foothills of the Olympic Mountain Range are substantially blocked by the Turpens' roof. To the north of the Turpen house the view remains unobstructed.

---

[22] *See, e.g.*, *State v. Stannard*, 109 Wn.2d 29, 36, 742 P.2d 1244 (1987); *Eurick v. Pemco Ins. Co.*, 108 Wn.2d 338, 341, 738 P.2d 251 (1987).

[23] *Foster*, 15 Wn. App. at 752.

The Turpens argue the trial court failed to find that they violated the one-story covenant, a material finding of fact, the omission of which should be construed in their favor on appeal.[24] The Baumans contend findings of fact 13 and 15 are the functional equivalent of a finding that the Turpens violated the one-story covenant.

¶24 Whether the Turpens violated the one-story covenant is a conclusion of law, not a finding of fact. The central question before the trial court was the purpose of the covenant, which it concluded was to preserve neighboring views and restrict the scale of neighboring structures. When we couple findings of fact 13 and 15 with this conclusion, the Turpens clearly violated the covenant by building a home that blocked the Baumans' view. It is the only logical conclusion to derive from these findings and the court's abatement order. Because it is a conclusion of law, the rule concerning construction of omitted findings does not apply here.

*Propriety of Injunctive Relief*

¶25 Enforcement of residential restrictive covenants is favored in Washington.[25] Generally, servitudes may be enforced by any appropriate remedy or combination of remedies.[26] Injunctive relief is one of these remedies.[27] When granting injunctive relief, the trial court considers: (a) the character of the interest to be protected, (b) the adequacy of injunctive relief when compared with other remedies, (c) the plaintiff's delay in bringing suit, (d) the plaintiff's clean hands, (e) the parties' relative hardship

---

[24] *See Pacesetter Real Estate, Inc. v. Fasules*, 53 Wn. App. 463, 475, 767 P.2d 961 (1989) ("If no finding is entered as to a material issue, it is deemed to have been found against the party having the burden of proof." (citing *Omni Group, Inc. v. Seattle-First Nat'l Bank*, 32 Wn. App. 22, 28, 645 P.2d 727, *review denied*, 97 Wn.2d 1036 (1982))).

[25] *Riss*, 131 Wn.2d at 622-24; *Metzner v. Wojdyla*, 125 Wn.2d 445, 450, 886 P.2d 154 (1994).

[26] RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 8.3 (2000).

[27] *Hollis*, 137 Wn.2d at 699; *Foster*, 15 Wn. App. at 752-53.

caused by denying or granting injunctive relief, (f) the interest of the public and other third parties, and (g) the order's enforceability.[28]

¶26 A trial court's decision to grant an injunction and the terms of that injunction are reviewed for an abuse of discretion.[29] A trial court abuses its discretion if its ruling is manifestly unreasonable or it exercises discretion on untenable grounds or for untenable reasons.[30] A decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard, or if the facts do not meet the requirements of the correct standard.[31] When a trial court orders injunctive relief, there is no abuse of discretion unless no reasonable judge would take the position adopted by the trial court.[32]

¶27 The Turpens argue the trial court erred by ordering injunctive relief on three grounds: (1) it is barred by laches, equitable estoppel, and acquiescence because the Baumans delayed bringing this suit against them; (2) monetary damages are adequate; and (3) the trial court failed to balance the relative hardships of the parties. They also assert that the trial court made an error of law by applying *Restatement of Contracts* section 360 (1932), arguing that this section does not apply to violations of restrictive covenants. These arguments are not persuasive.

¶28 The Turpens knew about the deed restriction when they purchased the lot and were equally aware that views were important to their neighbors. The doctrines of laches, equitable estoppel, and acquiescence do not apply here because the Turpens have known since 2000, when the

---

[28] *Lenhoff*, 22 Wn. App. at 74-75 (citing *Holmes Harbor Water Co. v. Page*, 8 Wn. App. 600, 603, 508 P.2d 628 (1973)).

[29] *Wash. Fed'n of State Employees v. State*, 99 Wn.2d 878, 887, 665 P.2d 1337 (1983).

[30] *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

[31] *In re Marriage of Horner*, 151 Wn.2d 884, 894, 93 P.3d 124 (2004).

[32] *Lenhoff*, 22 Wn. App. at 75 n.1 (quoting *Morgan v. Burks*, 17 Wn. App. 193, 198, 563 P.2d 1260 (1977)); *see also Jankelson v. Cisel*, 3 Wn. App. 139, 473 P.2d 202 (1970), *review denied*, 78 Wn.2d 996 (1971).

parties' negotiations about the one-story covenant began, that the Baumans would not consider code compliance sufficient if the structure violated the deed restrictions. The Baumans filed their lawsuit immediately after they learned DCLU had issued the building permit. There was no delay, reliance, or acquiescence here.

¶29 Despite the Turpens' argument that the Baumans' loss is ascertainable and adequately compensated by monetary damages, the Baumans' home and view are unique commodities that cannot be replaced with money. They are entitled to ask the court to restore what they had before the Turpens violated the covenant.[33]

¶30 *Restatement of Contracts* section 360 comment a at 643 provides:

> The remedy in money damages for breach of a contract for the transfer of a specific tract of land is regarded as inadequate without regard to quantity, quality, or location. A specific tract is unique and impossible of duplication by the use of any amount of money. . . .

In *Foster*, we applied *Restatement of Contracts* section 360 to remedies for restrictive covenant violations.[34] It applies equally here. We will uphold a trial court's order granting injunctive relief when substantial evidence supports the finding that the violation impairs a property owner's view and full enjoyment of the property.[35] The trial court did not abuse its discretion or make an error of law by ordering the abatement to restore the Baumans' view.

*Innocent Defendants*

¶31 In its written findings of fact and conclusions of law, the court found that:

---

[33] *See Foster*, 15 Wn. App. at 752-53 (land is generally considered a unique commodity which cannot be adequately replaced by money, and equity should intervene to restore land to the full enjoyment of the rightful owner).

[34] *Id.* (citing RESTATEMENT OF CONTRACTS § 360).

[35] *Id.* (citing RESTATEMENT OF CONTRACTS § 360).

28. On April 15, 2004, the current lawsuit was filed seeking the court's interpretation of the deed restriction and an injunction requiring abatement. At that time, only some initial clearing had occurred on the site although one of the defendants' contractors had purchased approximately $11,000 in materials.

. . . .

30. On April 19, 2004, four days after the lawsuit was filed, the Turpens had a surveyor reset and confirm the property boundaries and foundation location.

31. [Sometime] after May 19, 2004, the Turpens poured foundations and commenced construction of the house, which has been framed, sided and roofed, but not finished.

Based on these findings, it concluded that:

8. In framing a remedy for breach of a real estate covenant, balancing the equities is reserved for the defendant who proceeds without knowledge or warning that his structure encroaches upon another's property rights. *Bach v. Sarich*, 74 Wn.2d 575, 582, 445 P.2d 648 (1968).

9. The Turpens are not "innocent defendants" as that term is used in fashioning a remedy for a breach of a real estate covenant. However, the Turpens did make good faith and continuing efforts to resolve their neighbors['] concerns and proceeded with construction only after they were unable to satisfy all of the competing interests.

10. A defendant who commences and continues to build a project while a lawsuit is pending, which challenges the legality of such a project, proceeds at the risk of abatement.

¶32 The Turpens argue the trial court erred in concluding they were not innocent defendants. They concede a defendant is not innocent when he proceeds in the face of a clear covenant prohibiting the structure that is built. But they contend continuing to construct in the face of a lawsuit based on an ambiguous covenant is not enough to prohibit the court from balancing benefits and burdens. They assert that the trial court erroneously concluded that they were not innocent because (1) they stopped construction when the trial court issued its July 22 order, (2) the restrictive

covenant on their deed did not expressly require them to build a house that preserved neighboring views, and (3) the trial court found that they negotiated in good faith. Relying primarily on *Holmes Harbor Water Co. v. Page*[36] and *Lenhoff v. Birch Bay Real Estate, Inc.*,[37] the Turpens argue the trial court should have balanced the relative hardships of the parties before ordering any injunctive relief.

¶33 In *Holmes* and *Lenhoff*, we held that a trial court should balance the hardships and consider whether an injunction's effect will be disproportionate to the benefit secured by the plaintiff. But these cases do not support the Turpens' argument. In *Holmes*, we upheld the trial court's denial of injunctive relief in part because the defendant attempted to comply with the height restriction but was confused by its application.[38] In *Lenhoff*, we reversed the trial court's order granting injunctive relief even though the defendant knowingly violated a restrictive covenant because injunctive relief was not required to protect the plaintiffs' interests and the covenant provided for damages as a remedy.[39] These cases did not modify the Supreme Court's holding in *Bach*, which reserved the doctrine of balancing the equities or relative hardships for innocent defendants who proceed without knowledge or warning that their activity encroaches upon another's rights.[40]

¶34 The Turpens began construction knowing that their interpretation of the covenant was in dispute. Even though the trial court concluded that the Turpens made good faith

---

[36] 8 Wn. App. 600, 508 P.2d 628 (1973).

[37] 22 Wn. App. 70, 587 P.2d 1087 (1978).

[38] *Holmes*, 8 Wn. App. at 606.

[39] *Lenhoff*, 22 Wn. App. at 76.

[40] *Bach*, 74 Wn.2d at 582 ("The benefit of the doctrine of balancing the equities, or relative hardship, is reserved for the innocent defendant who proceeds without knowledge or warning that his structure encroaches upon another's property or property rights." (citing *City of Dunsmuir v. Silva*, 154 Cal. App. 2d 825, 317 P.2d 653 (1957); *Winthers v. Bertrand*, 239 Or. 97, 396 P.2d 570 (1964))).

and continuing efforts to resolve their neighbors' concerns, the court correctly concluded that they were not innocent defendants because they continued to build in the face of an ongoing lawsuit. We cannot distinguish these actions from those of the defendants in *Bach*, who were denied the benefit of balancing the hardships because they acted in knowing violation of real estate covenants and assumed the risk that the plaintiff would be awarded injunctive relief. Substantial evidence supports the trial court's findings that the Turpens knew their neighbors disputed their interpretation of the covenant but continued to work even though the Baumans had filed suit. These findings support the conclusion that they were not innocent defendants. The trial court correctly declined to balance the hardships as required by the holding in *Bach*.

*October 19, 2005 Order Amending Order*

¶35 In their motion for reconsideration, the Turpens asked the court for permission to use trusses that ranged in height from 30 inches on the ends to 36¼ inches in the center on the ground that compliance with the October 3 order was impossible. After receiving notice of the Turpens' motion, the Baumans wrote a letter to the trial court explaining that under King County Local Rule (KCLR) 7(b)(5)(B), they would not file a response unless the court requested one. On October 19, 2005, the court granted the Turpens' motion without requesting the Baumans' response. The Baumans challenge this order amending order on the ground that the trial court failed to comply with KCLR 7(b)(5)(B). Their answer would have demonstrated that the Turpens could comply with the original order.

¶36 Because the Turpens were not innocent defendants, they were not entitled to ask the court to balance the benefits and hardships on reconsideration.[41] Had the trial court requested a response from the Baumans under KCLR 7(b)(5)(B) before granting the motion for reconsideration, it

---

[41] *See id.* at 582.

would have learned that the Turpens' claim that compliance was impossible was incorrect. We therefore reverse the October 19, 2005 order.[42]

## CONCLUSION

¶37 We affirm the trial court's orders issued on July 22 and October 3, 2005. We reverse the October 19, 2005 order amending order and reinstate the trial court's original order granting the Baumans' request for injunctive relief.

Cox and ELLINGTON, JJ., concur.

---

[42] KCLR 7(b)(5)(B) provides:

No response to a motion for reconsideration shall be filed unless requested by the Court. No motion for reconsideration will be granted without such a request. If a response is called for, a reply may be filed within two days of service of the response.