195 P.3d 1027 (2008)
Morris MACK and Karilee Mack, husband and wife, Respondents,
v.
Byron ARMSTRONG and Laurie Armstrong, husband and wife, Appellants.
No. 26589-7-III.
Court of Appeals of Washington, Division 3.
November 18, 2008.
*1028 Jerome R. Aiken, Attorney at Law, Yakima, WA, for Appellants.
James Ketner Adams Jr., Wagner Luloff and Adams, Yakima, WA, for Respondents.
SWEENEY, J.
¶ 1 Specific provisions of real estate covenants take precedence over more general consent-to-construction provisions of those same covenants. Here, the covenants permitted construction of a residence up to 30 feet in height. The covenants also provided for approval of plans by an architectural committee. The trial court concluded that the appellants' house was under the 30-foot limit set out in the covenants but, nonetheless, ordered the owners to adhere to a decision of the architectural committee and remove the top four feet of their house. We conclude this was error and reverse.

FACTS
¶ 2 History: Byron and Laurie Armstrong and Morris and Karilee Mack own lots in the Vista Ridge Subdivision in Selah, Yakima County, Washington. Eleven of the subdivision's twelve lots are developed and generally face southward and westward for views of the Naches Valley basin, the Cascade mountain range, and partial views of Mt. Rainier and Mt. Adams.
¶ 3 The subdivision's developer recorded a "Declaration of Restrictive and Protective Covenants and Subjection to Assessment and Utility Liens." The relevant portions of the covenants state:
1. Paragraph 3 ("Land Use"): "No structure shall be more than thirty (30) feet in height, measured vertically from the highest point of the lot ... without the express written consent of the Architectural Control Committee." Clerk's Papers (CP) at 288.
2. Paragraph 4 ("Architectural Control Committee"): "the terms `building or structure' shall include, but not be limited to, any building, chimney, pole, antennae or tower, fence, tennis court, swimming pool, outbuilding, storage shed, dwelling, garage, carport and landscaping. No building or structure shall be built or placed or thereafter altered on any lot, ... until the details and written plans and specifications thereof disclosing clearing size, materials, location, finish and elevations have been submitted to and approved by the Architectural Control Committee." CP at 288-89.
3. Paragraph 4(1): "The Committee shall consider the orientation and location of the dwellings with the intent of preserving the views from any other dwelling." CP at 289.

*1029 4. Paragraph 4(3): "The dwellings may be single story or multiple story, provided that multiple story dwellings will not significantly impair the view from any other lot." CP at 289.
5. Paragraph 8 ("Enforcement"): "In the event of violation of the terms hereof, any owner of any lot subject hereto, or the Vista Ridge Association, may institute proceedings for abatement or injunction or for damages and reasonable costs, including plaintiff's reasonable attorney's fees." CP at 291.
¶ 4 The Armstrongs purchased their home from a previous owner in 1994. The Macks purchased a lot in the development also around 1994. The Macks sought and received approval from the subdivision's architectural control committee and built their home.
¶ 5 Several of the subdivision lot owners served as officers in the Vista Ridge Association. These same homeowners made up the architectural control committee established by the covenants. At least one of the subdivision residents, an attorney, expressed concerns that the covenants were "anemic" and unenforceable. Report of Proceedings (RP) at 216-17. He drafted proposed amendments to the covenants that have not yet been adopted.
¶ 6 The Armstrongs began construction of a significant addition to the back of their home in November 2002. The roof trusses arrived while the Armstrongs were out of town in early January 2003. Neighbor Linda Zingerman contacted the Armstrongs' builder and left a voice message on the Armstrongs' home phone to express her concern that the Armstrongs' addition would negatively affect her view of the surrounding scenery. Several informal and formal meetings followed. The meetings included, at various points, Mr. Armstrong, Mr. Mack, and neighbors Ken Kiest, James and Linda Zingerman, and Mark Smith. They discussed the architectural control committee's disapproval of the Armstrongs' plans and possible adjustments to the Armstrongs' project to satisfy the subdivision residents involved. The Armstrongs ultimately finished the roofline that winter.
¶ 7 Procedural History. The parties tried to resolve the dispute short of litigation. They were, however, unsuccessful. The Macks then sued for equitable and legal relief. The Armstrongs moved for summary judgment. The judge concluded that the Armstrongs' remodel resulted in a height less than the 30 feet as required by the covenants but nonetheless concluded that there remained material issues of fact that precluded summary dismissal of the Macks' suit.
¶ 8 After a bench trial, the court ordered the Armstrongs to remove the top four feet from the roof of their addition. The Armstrongs moved for reconsideration. The court denied that motion and entered findings of fact and conclusions of law and an order and judgment.

DISCUSSION

STANDING
¶ 9 The Armstrongs first contend that the Macks had no standing to assert violations of the covenants since it is the Zingermans' view that will be impaired, not the Macks' view. And they assert that the court erred by admitting and relying on evidence regarding damages to subdivision residents, James and Linda Zingerman, because they were not parties to the suit.
¶ 10 The trial court's determination that the Macks had standing to sue is a conclusion of law that we review de novo. See Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 880, 73 P.3d 369 (2003).
¶ 11 Our goal here is to construe these restrictive covenants by reading them in their entirety to ultimately determine the intent of the parties. Riss v. Angel, 131 Wash.2d 612, 621, 934 P.2d 669 (1997). "[I]f more than one reasonable interpretation of the covenants is possible regarding an issue, we must favor that interpretation which avoids frustrating the reasonable expectations of those affected by the covenants' provisions." Green v. Normandy Park Riviera Section Cmty. Club, Inc., 137 Wash.App. 665, *1030 683, 151 P.3d 1038 (2007), review denied, 163 Wash.2d 1003, 180 P.3d 783 (2008).
¶ 12 The covenants' plain language grants standing to any owner of a subdivision lot or the Vista Ridge Association to enforce the covenants in law or equity. CP at 291 (Declaration of Restrictive and Protective Covenants, ¶ 8). The Macks own a parcel in the subdivision. They then have standing to sue to enforce the covenants' terms.
¶ 13 The Armstrongs argue that the trial court's conclusion that the Macks had standing unreasonably subjects subdivision residents to suits from any or all fellow residents whether they were damaged or not. However, even apart from the explicit standing language of the Vista Ridge covenants, the general rule is that the owners of individual parcels are all individually entitled to enforce the restrictive covenant benefiting their properties. 2 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 5.7 (2000). And the "increase in the number of persons holding the benefit of the servitude alone does not constitute an unreasonable increase in the burden, even though it subjects the person burdened by the servitude to a potentially greater number of enforcement actions and higher transaction costs in negotiating with the benefit holders." 2 RESTATEMENT, supra, § 5.7 cmt. c. We agree with the trial court that the Macks had standing.

RESTRICTIVE COVENANTSGENERAL VERSUS SPECIFIC PROVISIONS
¶ 14 The Armstrongs argue that the holding of Riss v. Angel sets out a bright line rulewhere a document contains both a specific objective covenant and a general consent-to-construction covenant, the specific covenant controls. 131 Wash.2d at 624-26, 934 P.2d 669. So a homeowners association may not impose restrictions under a general consent covenant that are more burdensome than those provided by specific objective covenants. Id. at 638, 934 P.2d 669.
¶ 15 The Macks respond that Riss is not the "bright line authority" that the Armstrongs claim it to be. They argue that it is more nuanced and specifically allowed the trial court here to determine the intent of the covenants and interpret the meaning of the covenants based on that intent. And the court, therefore, properly found that the intent of the covenants was to protect the views of the Macks and the Zingermans. The Macks also argue that even if the Riss holding is the bright line rule the Armstrongs claim it to be, the Armstrongs violated the covenants on another ground. The covenants prohibit multiple story dwellings that significantly impair the view from other lots in the subdivision. Ex. 9, No. 1, p. 3; CP at 30. The trial court found that the Armstrongs' remodel was a multiple story dwelling because the 2002-03 addition has a loft connected to the main story by a staircase. CP at 30, 32.
¶ 16 We review conclusions of law de novo, whether or not the trial court styles them conclusions of law. Alexander Myers & Co. v. Hopke, 88 Wash.2d 449, 460, 565 P.2d 80 (1977). "[I]nterpretation of language contained in a restrictive covenant is a question of law for the court." Green, 137 Wash. App. at 681, 151 P.3d 1038 (citing Parry v. Hewitt, 68 Wash.App. 664, 668, 847 P.2d 483 (1992)).
¶ 17 The trial court expressed its view of the Vista Ridge covenants in both factual findings and conclusions of law. The court's relevant findings included that: The defendants' residence is on the lower tier of the subdivision while the plaintiffs' residence is on the upper tier. CP at 30. The covenants were "intended to protect the views of residences on the upper tier." CP at 30. And "[b]uildings in the Subdivision that exceed thirty (30) feet do not impair or obstruct views like the [d]efendants' addition does." CP at 30. The court concluded that the Armstrongs' property is subject to the restrictive covenants, and their 2002-03 remodel converted their residence into a two-story residence that substantially impairs the views from the Macks' residence and the nonparty Zingermans' residence. CP at 32.
¶ 18 "[C]ovenants providing for consent before construction or remodeling will be upheld so long as the authority to consent is exercised reasonably and in good faith." Riss, 131 Wash.2d at 625, 934 P.2d 669. But if the covenants include both specific *1031 restrictions of some aspect of design or construction and a general consent-to-construction provision the specific covenant prevails: "a homeowners association may not impose restrictions under a general consent to construction covenant which are more burdensome than provided for by specific objective restrictive covenants." Id. at 625-26, 638, 934 P.2d 669. The Riss opinion clarified that including a specific restriction in a covenant has the legal effect of signaling the document's intent "that the specific restriction apply rather than an inconsistent standard under a general consent to construction covenant." Id. at 625-26, 934 P.2d 669. "Specific, objective restrictive covenants involve primarily a nondiscretionary, ministerial procedure." Id. at 625, 934 P.2d 669 (citing Alliegro v. Home Owners of Edgewood Hills, Inc., 35 Del.Ch. 543, 122 A.2d 910, 912 (1956)).
¶ 19 Riss interpreted a covenant that bound owners in a subdivision in a fashion similar to the covenants here. In Riss, the applicable covenants provided "specific size, setback, and height requirements ... in terms of minimums and maximums" alongside a consent-to-construction covenant that gave the reviewing board discretionary authority to act according to express criteria. Id. at 626, 934 P.2d 669. The Riss covenants differ from the Vista Ridge covenants in that they do not allow the board to approve any construction over 20 feet while the Vista Ridge covenants permit construction over the 30-foot height maximum with the committee's written consent. Id.; CP at 288.
¶ 20 Peterson v. Koester applied the Riss holding and reversed a court order requiring the defendants to reduce the height of their addition. Peterson v. Koester, 122 Wash. App. 351, 92 P.3d 780 (2004). The Macks argue that Peterson is distinguishable because there the covenants had a clearly specified maximum height.
¶ 21 The Macks urge us to rely instead on Foster v. Nehls and Bauman v. Turpen to uphold the trial court's injunction on the ground that the Vista Ridge covenants' primary intent is to preserve views. Foster v. Nehls, 15 Wash.App. 749, 551 P.2d 768 (1976); Bauman v. Turpen, 139 Wash.App. 78, 160 P.3d 1050 (2007). But neither Foster nor Bauman addresses covenants that, like the covenants at issue in Riss, Peterson, and here, contain both a general consent-to-construction covenant and a specific, objective restrictive covenant. See Foster, 15 Wash. App. at 749-50, 551 P.2d 768; Bauman, 139 Wash.App. at 83, 160 P.3d 1050.
¶ 22 Here, the trial court found that the Armstrongs' remodel did not violate the specific restriction against building a structure higher than 30 feet, as measured from the highest elevation on the lot. CP at 30; see CP at 288. So here, as in Peterson, the injunction ordering the Armstrongs to remove the highest four feet from their 2002-03 addition imposes a more burdensome restriction on the Armstrongs under the consent-to-construction covenant in Paragraph 4 than the specific restrictive covenant in Paragraph 3. See CP at 288-89. The specific covenant controls. Riss, 131 Wash.2d at 625-26, 934 P.2d 669.
¶ 23 We therefore reverse the decision of the trial court and remand for entry of judgment in favor of the Armstrongs.
WE CONCUR: SCHULTHEIS, C.J., and KORSMO, J.