# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BIRNEY DEMPCY and MARIE DEMPCY, husband and wife, and their marital community, | No. 79697-6-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| CHRIS AVENIUS and NELA AVENIUS, husband and wife, and their marital community; JACK SHANNON, an individual; and RADEK ZEMEL, an individual, | |
| Respondents. | |

APPELWICK, J. — Dempcy's neighbors voted to remove a tennis court from property owned in common by the parties. Dempcy sued to stop the removal. He appeals the trial court's grant of summary judgment for the defendants that the removal vote complied with applicable CC&Rs. We affirm.

## FACTS

Birney and Marie Dempcy, Chris and Nela Aveniuses, Jack Shannon, and Radek Zemel own the four properties that make up the Pickle Point neighborhood in Bellevue. Each neighbor owns their own property, as well as an interest in a common area that abuts the properties. Maintenance of the common area is governed by the protective covenants, restrictions, easements, and agreements for the Pickle Point Association (CC&Rs). The CC&Rs establish an "Architectural

Control Committee" (ACC) to make maintenance decisions and assessments for the common area. The ACC is made up of one member representing each parcel owner other than the common parcel. The common property includes a tennis court that sits directly adjacent to the Dempcy property. The tennis court has fallen into a state of disrepair.

Dempcy has been discussing maintenance of the tennis court with his neighbors since at least 2003. At that time, the neighbors decided to put off maintenance for financial reasons. Dempcy again sought to perform extensive maintenance on the court from 2010-2013. Again, the neighbors decided to defer maintenance. Around that time, ownership of two of the parcels changed. The Aveniuses purchased one of the properties in 2012. Zemel moved into another property around the same time.

On May 18, 2013, the ACC met again to discuss maintenance of the common area. All owners from Pickle Point attended. They discussed the tennis court. That discussion centered on the question of whether to repair the court or remove it. Dempcy communicated during the meeting that he was not sure what to do "given the feeling of others that there is little interest in having a tennis court." Dempcy nevertheless discussed how many votes it would take to resurface the court versus removing it. The minutes from that meeting indicate that the question of whether to repair or remove the court had been discussed at previous meetings. Shannon produced a bid from a contractor at the meeting to remove the tennis court for $11,425.

On May 27, 2013, Avenius sent an e-mail to the other owners with another cost estimate for removing the court. That estimate put the total cost of replacing the tennis court with a green space at $19,120. He sent another e-mail on June 12, 2013 with sketches of how a new green area would look compared to the current tennis court. Dempcy sent an e-mail to the other owners later that day. In the e-mail, he described two "alternatives" for what could be done with the court. The first plan would be to maintain the tennis court "as required by the [c]ovenants." The second would be to create a green space in place of the tennis court. Dempcy recommended the committee, "vote on the second plan" at the next ACC meeting.

The ACC met again on June 22, 2013. At the meeting, Dempcy proposed an assessment on the owners to fund repair of the tennis court. Dempcy argued that such repairs were "ordinary maintenance of a tennis court" and presented an expert opinion supporting that contention. The three other owners voted against the assessment. They believed that such maintenance was "extraordinary" rather than "ordinary" and thus was subject to a different section of the CC&Rs. The other three owners also reiterated that they did not want to keep the tennis court and would rather convert the area to a greenbelt.

On July 9, 2013, Dempcy sent an e-mail to the other owners asking to be removed from any further discussion of common area maintenance. He indicated that he and his wife had "turned this matter over to our attorney." On July 17, 2013, Shannon sent an e-mail to the other owners calling for an ACC meeting to take place on July 23. His proposed agenda did not include discussion of the tennis court. Dempcy responded to the e-mail indicating that he would not attend the

3

meeting. However, he asked the ACC to consider tennis court maintenance at the meeting.

The ACC met on July 23, 2013. Shannon, Avenius, and Zemel were present. The owners tried to call Dempcy into the meeting, but were unsuccessful. A lengthy discussion of the tennis court occurred at the meeting. The owners voted 3-1[1] that Dempcy's proposed maintenance was "extraordinary maintenance" rather than "ordinary maintenance." Their stated reason for this determination was that the maintenance differed from the regular maintenance that had been occurring on the court, and that there was no budget for the type of maintenance that Dempcy proposed. They specifically noted that their interpretation was made in good faith, though it differed from Dempcy's, and that Dempcy could still accomplish the maintenance through a different section of the CC&Rs. They noted in the minutes that a determination by the ACC interpreting a term in the CC&Rs was final and binding.

The owners present then voted to remove the tennis court. They charged Avenius and Zemel with developing and proposing a plan to do so. The owners expected the plan to be executed in a three to five year time frame.

Dempcy then commenced this suit against the other owners on November 4, 2013. He sought a declaratory judgment that the tennis court must be maintained and could not be destroyed or removed. The other owners filed a

---

[1] The minutes do not indicate which owners voted for and against. They also do not explain how four owners voted when only three owners were in attendance. Presumably, the owners recorded Dempcy as a "no" vote based on his previously stated position on the issue.

motion for partial summary judgment. They sought to have the common area partitioned. They also sought a declaration that two of the four property owners could agree to changes to the common area, and dismissal of Dempcy's request of declaratory judgment. The trial court granted the motion.

Dempcy appealed to this court. Dempcy v. Avenius, No. 73369-9-I, slip op. at 3 (Wash. Ct. App. April, 3, 2017) (unpublished), http://www.courts.wa.gov/ opinions/pdf/733699.pdf. We concluded that trial court erred in ordering the common property partitioned. Id. at 6-7. We also found that the CC&Rs do not require that the tennis court must remain on the property in perpetuity. Id. at 9. We found that the ACC had authority to remove the court, but that such removal would qualify as an "extraordinary maintenance or capital improvemen[t] to the common property." Id. at 9-10. Such a decision would be subject to approval of two votes of the ACC. Id. at 10. Due to an inadequate record on appeal, we remanded the question of whether the ACC had appropriately exercised its authority to the trial court. Id. at 10.

On remand, the other owners filed a summary judgment motion seeking a declaration that the ACC had properly exercised its authority to eliminate the tennis court. Dempcy opposed the motion. He also requested the court grant summary judgment that the ACC be required to undertake his proposed repairs of the tennis court immediately. The trial court granted the other owners' motion for summary judgment and denied Dempcy's request for summary judgment.

Dempcy appeals.

5

DISCUSSION

Dempcy assigns four errors. First, he argues the trial court erred in finding the ACC properly exercised its authority to eliminate the tennis court. Second, he claims the trial court erred in declining to address whether the ACC was obliged to order his proposed repairs to the tennis court. Third, he argues the trial court erred in failing to find the other owners acted in bad faith by defining his proposed repairs as "extraordinary" maintenance. Last, he claims the trial court erred in granting the other owners' attorney fees and costs and denying his request for attorney fees and costs. Both sides request fees and costs on appeal.

We review summary judgment rulings de novo, viewing all facts and reasonable inferences from the facts in the light most favorable to the nonmoving party. Christensen v. Grant County Hosp. Dist. No. 1, 152 Wn.2d 299, 305, 96 P.3d 957 (2004). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The primary goal in interpreting covenants is to determine the intent or purpose of the covenants. Hollis v. Garwall, Inc., 137 Wn.2d 683, 695, 974 P.2d 836 (1999). Courts are to determine the drafter's intent by examining the clear and unambiguous language of the covenant. Bauman v. Turpen, 139 Wn. App. 78, 88-89, 160 P.3d 1050 (2007). Extrinsic evidence may be relevant in discerning that intent, where the evidence gives meaning to words used. Hollis, 137 Wn.2d at 695.

I.    Removal of the Tennis Court

6

Dempcy claims the trial court erred in finding the ACC properly exercised its authority to eliminate the tennis court. He argues that because removal of the tennis court constitutes "extraordinary maintenance or capital improvements," the CC&Rs required the ACC to fulfill certain procedural requirements, which the ACC failed to do.

Dempcy argues that the decision to remove the tennis court is governed by § 5.6 of the CC&Rs. That section provides,

> If the Committee determines that a special assessment is necessary for the extraordinary maintenance of or capital improvements to the common property, the Committee shall send notice of special assessment to the owners of all parcels. This notice shall include a statement of the reasons such an assessment is necessary, the amount to be assessed, the method of payment proposed by the Committee, and the date and place for a meeting to discuss such a special assessment. This meeting shall be held no sooner than thirty (30) days from the date of the notice of special assessment. The meeting will be conducted according to the rules adopted by the Committee, and the owner of each parcel shall be entitled to one vote for each parcel. Approval of the special assessment shall require consent of 50% of the Parcels excluding Parcel 5.

Respondents argue that § 5.6 is inapplicable because no assessment has been made. Dempcy does not dispute that no assessment has been made. He argues instead that § 5.6 is the "only basis for undertaking such extraordinary maintenance or capital improvement."

The clear and unambiguous language of § 5.6 refers only to assessments. It is entitled "Special Assessments." Its requirements include informing other owners of the "amount to be assessed" and the "method of payment." Thus, the most reasonable reading of the section is that it applied only to the decision to

assess owners an amount of money to pay for extraordinary maintenance or capital improvements, not the initial decision to undertake such improvements.[2]

This reading is supported by extrinsic evidence. Namely, the minutes from ACC meetings, and the parties' communications with one another indicate that they believed that the requirements § 5.6 were triggered only when an assessment was to be made, and not before. Though the parties communicated at length regarding the tennis court in e-mail and in ACC meetings, nobody asserted that the requirements of § 5.6 needed to be followed in order for those discussions to begin. Dempcy advocated for a vote on a plan to replace the tennis court in an e-mail to the owners in advance of the June 22 ACC meeting. He did not claim that such a vote would require compliance with § 5.6. The only communication in the record that explicitly invokes § 5.6 and attempts to comply with its procedural requirements is a July 23 e-mail calling for a meeting to assess costs on members to complete a retaining wall.

The owners, in interpreting the CC&Rs during the July 23 meeting, recognized that any plan to repurpose the tennis court into a green space would require a special assessment vote under § 5.6. But, the owners proceeded to approve a motion indicating they no longer wished to have a tennis court in the commons. They indicated that this plan would be executed in a three to five year timeframe. This course of action is consistent with their understanding that the

---

[2] The CC&Rs give the ACC general authority over maintenance and upkeep of the common area. They also give it limited authority over the four parcels to accomplish the goals of the CC&Rs.

only step in the planning process that required compliance with § 5.6 was the actual assessment of money on the owners to pay a contractor to begin the work.

We find that § 5.6 of the CC&Rs applies only to assessments, not an initial vote to remove the tennis court.

This court previously recognized that the ACC had authority to remove the tennis court if two owners so voted. Dempcy, slip op. at 9-10. There is no dispute that three owners voted to remove the tennis court on July 23, 2013. Because § 5.6 does not apply to that initial decision, nothing else was required of the members ACC to appropriately exercise its authority.

It is also clear that the ACC weighed all reasonable options before making a decision to remove the tennis court. The ACC specifically considered whether to leave the tennis court as is, repair it, convert it to a grassy area, or reallocate ownership. Dempcy submitted a bid from a contractor reflecting the cost of repair. Shannon produced a bid reflecting the cost of removal. Avenius produced a bid and drawings of different plans to convert the court to a green space. The ACC discussed that failing to do anything about the court would decrease the value of all members' properties. After considering the three options, members of the ACC determined that removing the tennis court would best serve their interests.

We affirm the trial court's grant of summary judgment that the ACC properly exercised its authority to remove the tennis court.

II. Maintenance of the Tennis Court

Dempcy argues that the trial court erred in declining to address his argument that his proposed repairs to the tennis court were "ordinary" maintenance

9

that the property owners were required to fund. He argues that this court remanded that issue to the trial court, along with the question of whether the ACC appropriately exercised its authority to remove the court. He points to the following language from this court's previous opinion:

> We leave to the trial court the question or whether the ACC has exercised its authority to eliminate the tennis court. Whether the tennis court is to be maintained or replaced, all owners are entitled to have the action taken in a reasonable and timely manner, overseen by the trial court if necessary. It would be no more acceptable for the ACC to leave the common property in a state of perpetual construction than to leave it in a state of perpetual disrepair. We remand to the trial court for further proceedings regarding the ACC's maintenance of the common property.

Dempcy, slip op. at 10. The parties agree that the paragraph remands the issue of whether the ACC appropriately exercised its authority to remove the tennis court. Dempcy argues that the last sentence remands an additional question: whether the ACC was required to order resurfacing of the tennis court as "ordinary maintenance." "Ordinary maintenance" is mandatory under the CC&Rs.

This court did not remand two issues. Rather, this court remanded the single question of whether the tennis court was to be repaired or replaced. Dempcy, slip op. at 10. The resolution of that question determined the path forward on the other issues. If the ACC had in fact exercised its authority to remove the court, it would not also be required to resurface it before it was removed. Such an expense would be a waste. Ordinary maintenance would remain necessary should the removal be delayed significantly. We encouraged the trial court on remand to supervise a timely resolution, if necessary. Id. But, Dempcy does not allege that delay in removal of the tennis court requires ordinary maintenance in the

10

meantime. He challenges only the decision to remove rather than resurface the tennis court.

Dempcy argues that the ACC's determination was not made in good faith. He argues that a "maintenance assessment" is understood to be an assessment "for the purpose of keeping an improvement in working order." So, he argues that whatever amount was necessary to keep the tennis court in working order must be "ordinary maintenance." He also produced an expert report indicating that outdoor tennis courts in Western Washington must be resurfaced every five to eight years.[3] But, the ACC had not done what Dempcy describes as ordinary maintenance for many years prior to the change in ownership and makeup of the ACC. The dispute here is not about the word "maintenance." The ACC's interpretation differentiated between two different types of maintenance: ordinary and extraordinary.

Under § 6.6 of the CC&Rs, the ACC has authority to interpret the terms in the CC&Rs. The ACC explicitly exercised that authority in its July 23, 2013 meeting to interpret "ordinary maintenance" to include only that work that was ordinarily done to the tennis court on a yearly basis. It determined that resurfacing would be considered "extraordinary maintenance" governed by § 5.6. Section 6.6 provides that the ACC's good faith interpretations of the CC&Rs are final and binding.

---

[3] The expert described resurfacing as "ordinary maintenance." Dempcy also apparently shared this expert's opinion with the ACC. While the ACC was certainly free to consider this opinion in interpreting the CC&Rs, it was not obliged to agree with it. The CC&Rs give authority to the ACC to interpret the CC&Rs. The only limitation on this authority is that it be exercised in good faith.

The ACC differentiated resurfacing from ordinary maintenance because there was no approved budget for such maintenance. It also differentiated such maintenance because it was different than the maintenance that had been occurring on a yearly basis. "Ordinary" means "in the usual course of events" or "being of frequent occurrence." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1586 (2002). An interpretation that differentiates between maintenance that occurs yearly and that which must occur every five to eight years fits within that definition. And, it is appropriate for the ACC to consider the maintenance cost in its interpretation because the terms it was interpreting were from sections of the CC&Rs that deal with assessing costs on owners. That the CC&Rs impose additional procedural requirements on "extraordinary" maintenance is most likely because those costs would be a greater financial burden on the owners. The ACC was aware of its obligation to act in good faith. It considered Dempcy's option, it made a decision, and specifically noted that it made its determination in good faith.

Dempcy nevertheless argues that the other owners acted in bad faith, because they did not want to have the tennis court and so did not want to spend money to repair it. But, a decision to remove the tennis court is squarely within the ACC's authority. Dempcy, slip op. at 9-10. The ACC exercised that authority. It was reasonable at that point to determine that resurfacing of the court was not necessary if the court was going to be removed. Dempcy has not demonstrated bad faith by the ACC members.

The trial court did not err in finding the ACC members acted in good faith, nor in declining to order maintenance rather than removal of the tennis court.

12

III.    Attorney Fees

Dempcy argues the trial court erred in granting the other owners' attorney fees and denying him attorney fees and costs below.  Both sides request attorney fees and costs on appeal.  Secton 6.1 of the CC&Rs states that the "prevailing party in any action brought to enforce the covenants . . . shall have the right to collect attorney[] fees, court costs, and other expenses of litigation."  The parties do not dispute that § 6.1 entitles the prevailing party to fees and costs below and on appeal.  Because we affirm the trial court's grant of summary judgment for the respondents, we also affirm the award of attorney fees and costs, and grant the same for this appeal.

_Appelwick, J._

WE CONCUR:

_Andrus, A.C.J._     _Dwyer, J._

13